AMERADA HESS CORPORATION,
Plaintiff,

v.

SS PHILLIPS OKLAHOMA, her engines,
boilers, tackle, etc., and Philtankers,
Inc., Defendants.

No. 78 Civ. 1933 (JES).

United States District Court,
S.D. New York.

March 3, 1983.

Hill, Betts & Nash, New York City, for plaintiff; Kenneth Geller, Christopher Raleigh, New York City, of counsel.

Burlingham, Underwood & Lord, New York City, for defendants; Terry L. Stoltz, Barbara Dunne, New York City, of counsel.

## OPINION AND ORDER

SPRIZZO, District Judge.

Plaintiff Amerada Hess Corporation ("AHC") commenced this civil action under the admiralty and maritime jurisdiction of the United States[1] seeking to recover damages from defendant, Philtankers, Inc. for its failure to deliver 8,681 barrels of oil from an ocean shipment of 627,661 barrels, for which AHC was consignee and Philtankers, Inc. was carrier.[2] Defendant denies liability for non-delivery of the oil, disputes the amount not delivered and counterclaims for damages for demurrage and for costs allegedly incurred in cleaning its vessel to remove that portion of plaintiff's oil retained on board.

In 1976, Mitsui and Company (USA), Inc.[3] (the "Shipper") contracted with defendant by charter party agreement, Trial Exhibit 81 (Trial Exhibits are hereinafter referred to "Ex. ___"), to transport a cargo of Low Sulphur Waxy Residue oil ("LSWR") from Dumai, Indonesia to St. Croix, Philadelphia or New York, the port of delivery to be at the election of the consignee. Plaintiff became the consignee when it purchased a negotiable bill of lading for the cargo[4] from the Shipper, Ex. 1, pursuant to a contract of sale. Ex. 19.

Plaintiff exercised its right of election under the bill of lading and directed defendant's vessel to proceed to New York/Philadelphia. Deposition of Schmidt at 9–10, 16–18; Ex. 37. Although beset by mechanical difficulties aboard the S.S. Phil-

---

1. 28 U.S.C. § 1333 (1976).

2. Philtankers, Inc. is the owner of the S.S. Phillips Oklahoma, the in rem defendant in this case.

3. Mitsui is not a party to this action.

4. Pursuant to COGSA, the bill of lading serves as the contract of carriage between carrier and consignee. 46 U.S.C. § 1300 et seq. (1976); *Amoco Overseas Co. v. S.T. Avenger,* 387 F.Supp. 589 (S.D.N.Y.1975).

lips Oklahoma while en route,[5] defendant complied with plaintiff's direction, Pre-Trial Order, Undisputed Facts No.'s 7 & 8. The cargo was discharged at three ports over a period of seven days between February 24, 1977 and March 3, 1977. Ex. 18. Upon completion of discharge operations at the last point of discharge, Port Reading, ullage measurements were taken by an independent surveyor employed for this purpose. The measurements revealed that 8,681 barrels of oil remained on board.

■ It is well settled that a cargo owner's prima facie case for recovery of the value of cargo is established upon a showing that the ocean carrier accepted for carriage goods described in a negotiable bill of lading as being in apparent good order and condition and subsequently failed to deliver them or delivered them in damaged condition. *Baby Togs, Inc. v. S.S. American Ming,* 1975 A.M.C. 2012, 2016 (S.D.N.Y. 1975). Since defendant executed the bill of lading attesting to the receipt in good order

and condition of 627,661 barrels of LSWR, and since the Court finds that 8,681 barrels of LSWR were not delivered,[6] the Court concludes that the plaintiff has established a prima facie case for recovery of the value of the undelivered cargo, which, based on a purchase price of $13.42 per barrel, Ex. 19, is $116,499.02.[7]

■ Under the Carriage of Goods by Sea Act of 1936, 46 U.S.C. §§ 1300–15 (1976) ("COGSA"), once a prima facie case has been established the burden of proof is on the carrier to establish that the damage was not due to its negligence, or that it was occasioned by one of the "excepted causes" listed in § 1304(2). *Demsey & Associates v. S.S. Sea Star,* 461 F.2d 1009, 1015 (2d Cir. 1972). Defendant raises three defenses that it asserts operate as a complete bar to plaintiff's recovery, to wit: (1) that the non-delivery was a result of an inherent vice of the cargo 46 U.S.C. § 1304(2)(m); (2) that plaintiff's loss was a result of plaintiff's own fault in directing defendant's ves-

---

**5.** See discussion *infra.*

**6.** Defendant disputes the figure of 8,681 barrels, noting that the Ship's Dry Tank Certificate, Ex. 17, indicates that 8,266 barrels of LSWR remained on board. However, according to the testimony of the independent surveyor who took the ullage measurements, the figure of 8,266 barrels resulted from a mathematical error in adding the ullage measurements of the separate tanks. T at 36–37. The surveyor testified that he later found the error and corrected his calculations, Ex. 65, to reflect the true volume of oil remaining on board, to wit, 8,681 barrels. T at 36–37.

Defendant next argues that, since the LSWR must have been pumped out of the tanks at a temperature of at least 115°F, and since liquids expand when heated, the Court should reduce the volume of LSWR found to have been retained on board by a factor of .9772 to reflect what the volume would have been at the industry standard of 60°F. Defendant's Main Post-Trial Brief at 22. While it is clear that liquids do expand when heated, the Court rejects defendant's argument since defendant's representative agreed to employ a correction factor of 1.0000 when he signed the surveyor's report, Ex. 65.

Moreover, the application of the .9772 factor would result in a *de minimis* change in defendant's liability. Instead of 8,681 barrels at 115°F, there would remain 8483.0732 barrels at 60°F—a reduction of 197.9268 barrels, amounting to $2,656.18 at $13.42 per barrel.

Defendant further asserts that the amount of undelivered cargo should be reduced by a trade allowance of .5%. Defendant's Main Post-Trial Brief at 22. Although the Court is aware of the recent decision in *Sun Oil Co. v. M/T "Mercedes Maria",* slip op. 80–4862 (E.D.Penn. Dec. 29, 1982), sustaining the application of the .5% trade allowance, the decisions are to the contrary in this District, *Esso Nederland v. Trade Fortitude,* 1977 A.M.C. 2144, 2148 (S.D.N.Y. 1977); *Kerr-McGee Refining Corp. v. M/V Libertad,* 529 F.Supp. 78, 85 (S.D.N.Y.1981). Accordingly, there will be no reduction of the amount of cargo undelivered based on such trade allowance.

Finally, defendant argues that, since the oil remaining on board was in an unpumpable state, it is thereby relieved of liability for its non-delivery. In support of this proposition, defendant cites arbitral awards holding that a carrier's duty to deliver does not extend to liquid cargo in an unpumpable state. Defendant's Main Post-Trial Brief at 7–8. Since, as will emerge in the discussion *infra,* defendant's negligence in transporting and discharging plaintiff's cargo caused the LSWR to congeal, defendant cannot escape liability by complaining that it could not discharge the cargo because it was unpumpable. The arbitral decisions referred to are therefore irrelevant.

**7.** The price included prepaid freight. Ex. 19.

sel to New York/Philadelphia in winter and in failing to expedite the unloading of the oil, *id.* at § 1304(2)(i); and (3) that plaintiff's loss was caused by something other than the fault or neglect of the carrier, its agents or servants, *id.* at § 1304(2)(q).[8]

Defendant first argues that plaintiff's oil was retained because of an inherent vice in the cargo, to wit, the propensity of LSWR to become unpumpable when exposed to frigid weather conditions.[9] It characterizes its failure to deliver as "the normal and expected result of discharging a cargo of LSWR over a period of seven days in the winter in Philadelphia and New York." Defendant's Pre-Trial Memorandum at 4.

■ It is well settled that, when a carrier accepts cargo, it is charged as a matter of law with knowledge of its characteristics and is obligated to give it the care required. *Levatino Co. v. American President Lines, Ltd.,* 233 F.Supp. 697, 701 (S.D.N.Y.), aff'd. 337 F.2d 729 (2d Cir.1964). Plaintiff's expert convincingly testified, and the Court finds, that, when proper techniques are employed, LSWR can be discharged in cold weather without significant retention of cargo.[10] Moreover, the Court finds, based on the evidence offered at trial, that de-

fendant's failure to deliver the LSWR was occasioned not by the properties of the cargo but rather by mechanical problems with the vessel and deficiencies in crew operations during discharge, which, as set forth below, the Court finds were a consequence of defendant's own negligence.

■ Barely one day out of Dumai, it was necessary to put into Singapore for several days of repairs to engine room machinery. Ex. 15. After departing Singapore, the vessel began to consume excessive amounts of distilled water because of a steam leak in the vessel's cargo heating system. Exs. 38, 41, 47–49, 51, 53. In an unsuccessful attempt to locate the source of the leak, the crew shut down the cargo heating coils for a thirty-hour period. Ex. 14, January 22, 1977 entry. In addition, during discharge operations, it was discovered that one of the cargo stripping pump lines had a hole in it, thus accounting for the fact that the stripping procedure went "a little slower" than "expected."[11] Deposition of Arnett at 31.

In addition to the mechanical problems that plagued the vessel itself, the crew's conduct during discharge operations evinced serious deficiencies. At the first of the

---

8. § 1304. Rights and immunities of carrier and ship.

 . . . . .

 (2) Uncontrollable causes of loss

 Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from—

 . . . . .

 (i) Act or omission of the shipper or owner of the goods, his agent or representative;

 . . . . .

 (m) Wastage in bulk or weight or any other loss or damage arising from inherent defect, quality, or vice of the goods;

 . . . . .

 (q) Any other cause arising without the actual neglect of the agents or servants of the carrier, but the burden of proof shall be on the person claiming the benefit of this exception to show that neither the actual fault or privity of the carrier nor the fault or neglect of the agents or servants of the carrier contributed to the loss or damage. 46 U.S.C. § 1304 (1976).

9. The pour point of oil is the temperature at which it begins to flow. LSWR, a type of Number 6 fuel oil, Plaintiff's Trial Memoran-

dum at 1, has a high "pour point," variously put at between 110°F and 120°F. Ex. 82, Plaintiff's Trial Memorandum at 2, Defendant's Main Post-Trial Brief at 22. If LSWR is cooled below its pour point, it congeals and is unpumpable. Plaintiff's Trial Memorandum at 2 n. 1. Oil tankers that transport LSWR are, therefore, equipped with heating coils in their cargo tanks.

10. Plaintiff's expert, Glenn, who specializes in supervising the discharge of LSWR cargoes, testified that he had personally supervised the discharge of between 20 and 30 such cargoes in New York during the winter months. T at 272–73.

Defendant's expert, who testified to the contrary, admitted on cross examination that he had never discharged a cargo of LSWR in New York in winter. T at 186.

11. The cargo stripping pumps are used to remove that portion of cargo which remains after the level of oil in the tanks has sunk below that at which the main cargo pumps can remove it. T at 274–75.

three discharge points, Bigstone Anchorage, notwithstanding the cold temperatures and the propensity of LSWR to congeal if not adequately heated, the crew failed to keep the cargo circulating through the exposed deck lines to maintain proper temperature. Indeed, circulation through these lines was halted for a period of 34.5 hours. Engine Log Book, entries for February 25–27, 1977, Ex. 14. Later, at the final discharge point, Port Reading, two of the vessel's four discharge lines became clogged with solidified LSWR and, thus, inoperative, despite a belated and ineffectual effort to thaw the lines with externally applied steam. Deposition of Arnett at 53–54.

On the basis of this evidence and plaintiff's expert's testimony, which the Court finds both credible and persuasive, the Court concludes that defendant's negligence caused plaintiff's loss. The defense of inherent vice raised under § 1304(2)(m) must therefore be rejected. It follows a fortiori that defendant also has failed to meet its burden under § 1304(2)(q) of showing that its negligence did not contribute to the loss.

■ Having concluded that plaintiff's loss was occasioned by defendant's negligence, it also follows that defendant's counterclaim for the costs of cleaning its vessel's tanks must be disallowed.

■ There remains for consideration defendant's argument pursuant to § 1304(2)(i) that plaintiff caused its own loss in that (1) it failed to require that the cargo be heated at a temperature in excess of 135°F; (2) it elected New York/Philadelphia as discharge ports in winter; and (3) it failed to expedite unloading of the cargo by providing sufficient lightering barges. Defendant's Main Post-Trial Brief at 9. None of these acts or omissions is sufficient to relieve defendant of liability. While defendant argues that plaintiff's own standards required that the LSWR be heated to a temperature of between 141°F and 150°F, Defendant's Main Post-Trial Brief, at 10, the Court finds that both parties agreed

that the cargo would be heated to a temperature of 135°F. Exs. 1, 19, 81. The Court further finds, based on plaintiff's expert's testimony, that 135°F is an adequate and proper level of heating for a cargo of LSWR. Trial Transcript at 274 (hereinafter "T____").

Defendant's second contention is easily disposed of. Having agreed in the bill of lading to deliver LSWR to New York/Philadelphia in winter if so directed by plaintiff, defendant cannot now exonerate itself of liability for its failure to deliver on the grounds that plaintiff exercised its contractual right.

Finally, defendant argues that, because plaintiff was tardy in providing sufficient lightering barges, the cargo was exposed to cold weather for seven days, causing the excessive clingage and retention that occasioned plaintiff's loss. Defendant's Main Post-Trial Brief at 11–12. The Court observes that there is no evidence in the record to support defendant's contention that plaintiff was tardy in providing lightering barges other than the fact that discharge operations extended for seven days. However, even assuming arguendo that there was a delay in providing lighters, plaintiff's expert testified, and the Court finds, that winter discharges of LSWR commonly extend up to ten days without significant retention of cargo, T at 272. The Court concludes that any such delay, while relevant to the question of defendant's claim for demurrage, was not the cause of plaintiff's loss and that defendant therefore has failed to establish a defense under § 1304(2)(i).

■ There remains for consideration defendant's counterclaim for demurrage in the amount of $30,068.95, representing 88 hours and 43 minutes of compensable delay beyond the 36-hour allowance provided for in the charter party. T at 84; Defendant's Main Post-Trial Brief at 30. The Court rejects plaintiff's argument that it cannot be bound by the provisions of the charter party.[12] Its contract of sale with the Ship-

12. Plaintiff argued that it could not be bound by the provisions of the charter party since it is

not a party to that agreement and since the

per expressly provides that demurrage shall be paid to the carrier in accordance with the charter party between the Shipper and the carrier. Ex. 19. Alternatively, plaintiff argues that defendant is entitled to recover only $21,735.74 in demurrage since it breached the pumping warranty contained in the charter party and thus contributed to the delay.[13] Plaintiff's Post-Trial Memorandum at 32. The Court agrees that, in calculating damages for demurrage, it is appropriate to consider whether and to what extent defendant has breached its pumping warranty. That issue shall be referred to a magistrate for determination.

 Finally there remains the question of pre-judgment interest. It is well settled that pre-judgment interest in admiralty cases is committed to the sound discretion of the trial court, and should be granted absent exceptional circumstances. *Mitsui & Co., Ltd. v. American Export Lines, Inc.,* 636 F.2d 807, 823–24 (2d Cir.1981). Accordingly, pre-judgment interest is granted at the rate of 9.95%, based on the average yield of three-month Treasury Bills for the years 1977 through October 1981, which the Court finds to be a reasonable interest rate.[14] Interest shall accrue from March 3, 1977, the date on which defendant's vessel ceased pumping plaintiff's cargo ashore. *Mitsui, supra.*

SO ORDERED.

charter party was never incorporated into the bill of lading.

**13.** Plaintiff contends that defendant's figure of 88 hours and 43 minutes of compensable delay must be reduced by 24 hours and 3 minutes.

**14.** Post-judgment interest shall accrue at the rate set pursuant to 28 U.S.C. § 1961.