**ARMADA SUPPLY, INCORPORATED, Plaintiff,**

v.

**S/T AGIOS NIKOLAS, her engines, boilers, etc., and against Lace, Limited, Black Barnett Shipping Corporation, Black Baronett Shipping Corporation, Black Count Shipping Corporation, Magelan, Inc., Magelen Maritime, Inc., Shipping and Trading International Corporation, and Anastasios Karavaias, Defendants.**

**No. 83 Civ. 603 (WCC).**

United States District Court,
S.D. New York.

July 25, 1985.

Donovan Maloof Walsh & Kennedy, New York City, for plaintiff; Donald M. Kennedy, Richard E. Repetto, John A.V. Nicoletti, Charles E. Schmidt, Edward C. Radzik, New York City, of counsel.

Dickerson, Reilly & Mullen, New York City, for defendants S/T Agios Nikolas, Black Barnett, Black Baronett, Black Count, Magelan, Inc., Magelen Maritime, Inc., Shipping and Trading Intern. and Anastasios Karavaias; Robert W. Mullen, Janet Lydon Vagt, New York City, of counsel.

Hill, Betts & Nash, New York City, for defendant Lace, Ltd.; Terence Gargan, Benjamin E. Haller, John C. Mamoulakis, Gary J. Wolfe, New York City, of counsel.

## OPINION AND ORDER

WILLIAM C. CONNER, District Judge.

This is an admiralty action commenced by Armada Supply, Incorporated ("Armada"), the owner and consignee of an ill-fated cargo of fuel oil shipped from Rio de

Janeiro to New York City aboard the S/T Agios Nikolas ("the Agios Nikolas") in late 1982. Plaintiff seeks compensatory and punitive damages from the charterers, operators and agents of the vessel, alleging that these defendants were responsible for a shortage, contamination and conversion of the cargo.[1] The matter was tried before the Court sitting without a jury, and this Opinion and Order incorporates the Court's findings of fact and conclusions of law pursuant to Rule 52, F.R.Civ.P. For the reasons below, judgment will be entered in favor of plaintiff.

### Background

It became apparent shortly after the commencement of this action that an intriguing tale was likely to unfold if the matter were to go to trial; that early expectation was not disappointed. As reflected, perhaps, in the very fact that plaintiff's claims could not be resolved without a trial, this is no "run-of-the-mill" cargo case. It involves charges of cargo hijacking and blackmail, ransom and deceit—all the elements of a good high seas drama, short of mutiny.

The trial of this matter consumed three days. Plaintiff's evidence, as accurately described in its post-trial statement of the facts, can be summarized as follows:

On November 16, 1982, the vessel Agios Nikolas began loading a cargo of No. 6 fuel oil at the terminal of Petroleo Brasiliero, S.A. ("Petrobras") in Rio de Janeiro. Petrobras, through a Brazilian government entity called "Fronape," had entered into a charter party with defendant Black Baronett Shipping Corporation, for carriage of the cargo to New York. The oil belonged to Armada, a buyer and trader of crude oil and petroleum products, which had purchased it from a Petrobras subsidiary on C.I.F. terms, under an irrevocable letter of credit. Armada had contracted to sell the entire shipment to the Sun Oil Trading Company ("Sun Oil") for a price of $30.55 per barrel, on the following conditions: delivery had to be made to Sun Oil in New York on or before December 10, 1982; the bottom sediment and water content ("BS & W") of the oil was not to exceed one percent by volume; and the pourpoint was not to exceed 60°F.

Tests performed by the oil cargo surveying firm of E.W. Saybolt & Co. ("Saybolt") on samples drawn from Petrobras's five shore tanks just before the oil was loaded onto the vessel showed only small traces of BS & W in three of the tanks, 0.1% in the fourth, and 0.2% in the fifth. The pourpoints measured between 37°F. and 48°F. Pl.Ex. 58 at 4-5. Saybolt performed an analysis of the cargo after it was loaded as well. A composite sample collected from the ship's various cargo tanks after loading showed a BS & W of 0.1% and a pourpoint of 48°F. Pl.Ex. 58 at 5. As was customary in the industry, additional samples from the shore tanks and the ship tanks were drawn and placed in bottles, which were labelled, sealed with wax to prevent tampering, and given to the ship's master.

After the vessel finished loading, the ship's sea valves were closed and the master issued a clean bill of lading reflecting receipt of 348,614.572 barrels of No. 6 fuel oil in good order and condition. Pl.Ex. D–3C. Although the ship's own records apparently indicated that only 340,693.497 barrels were loaded, the bill of lading was issued without any notation of a discrepancy. According to one of plaintiff's witnesses, the ship's master would have asked to make an exception on the bill of lading had there been something wrong with the cargo. (Tr. at 207).

Late in the evening of November 16th, the Agios Nikolas departed Rio de Janeiro. For reasons not entirely clear from the record, the vessel took considerably more

---

1. Among the defendants named in Armada's complaint was Lace, Limited ("Lace"), the registered owner of the Agios Nikolas. Lace had bareboat chartered the vessel to defendant Black Count Shipping Corporation, which had, in turn, subchartered the vessel to defendant Black Baronett Shipping Corporation. I dismissed the action as against Lace at the close of plaintiff's case on the grounds that plaintiff had established no connection between Lace and the shortage or contamination of plaintiff's cargo, and no relationship between Lace and the other defendants that would render it liable for their misconduct.

time than expected in making its way to New York.[2] At some point during the voyage, plaintiff realized that the cargo would not reach its destination by December 10th, as required by the Sun Oil contract. This was a distressing prospect because the price of oil had dropped substantially after the contract was negotiated, and Armada knew that Sun Oil would be looking for any available reason to refuse delivery. Armada's agents therefore agreed to pay a "speed bonus" of $20,000 to the vessel's agent, defendant Shipping and Trading International.

The Agios Nikolas sped onward and arrived at a terminal off Staten Island on December 9, 1982. There, it tendered a notice of readiness to discharge its cargo. Pursuant to an agreement between Armada and Sun Oil, Saybolt surveyors went aboard immediately to measure and sample the quantity and quality of cargo. Complete analysis of the samples took several days. In the meantime, Sun Oil directed the vessel to discharge approximately 50,000 barrels of oil into a barge, and then to stand by for orders to discharge the remainder at a terminal in Bayonne, New Jersey.

On either December 10th or December 11th, Armada representatives first learned that the cargo did not meet contract specifications. Ken Griffin, Armada's president, recalled that he became aware of problems when the barge was loaded. John Decker, another Armada employee, testified in a deposition that he received a call from Saybolt on or about December 11th. In any event, on December 14th, Saybolt telexed a report of its preliminary findings; the telex indicated that the ship arrived carrying only 340,484 barrels of oil, that a composite sample of oil drawn from the various cargo tanks yielded a BS & W of 1.6% by volume, and that the pourpoint on arrival was 65°F.

Saybolt had found, in addition, a total of 1663 barrels of free water in the cargo tanks.[3] Based on a chemical analysis, Saybolt later determined that most of this was seawater. The telex also indicated that the vessel's sea valves had been open upon arrival in New York, and Saybolt had sealed them.

After receiving Saybolt's report, Sun Oil immediately informed Armada that it was rejecting the cargo for non-conformance with the contract specifications. Pl.Ex. 6-5G. Armada then entered into negotiations with Sun Oil to reach a reduced purchase price. On December 16th, Sun Oil agreed to pay Armada $27.65 per barrel for the entire cargo.

In the meantime, a second survey was performed. On December 15th, representatives of the cargo underwriters, the vessel's owners, Armada and Petrobras conducted a joint survey. *See* Pl.Exs. 24, 26; Lace Ex.S. The results of this survey confirmed that three of the ship's seven cargo tanks contained oil with a BS & W of greater than 1%.

On or about December 17th, attorneys for plaintiff's cargo insurers contacted defendant Shipping and Trading International and the vessel's P & I Club, requesting that they post a bond in an amount sufficient to cover plaintiff's claim for shortage and contamination. When the request was refused, the cargo insurers instituted suit and obtained a warrant for the arrest of the vessel. Early the next day, before the warrant could be executed, the Agios Nikolas advised the Coast Guard that it was going on sea trials and fled the jurisdiction. Later that day, Emmanuel Karavaias sent a telex to plaintiff from Greece. Emmanuel Karavaias, along with his son defendant Anastasios Karavaias, was a principal of defendants Shipping and Trading International, Black Count and Black Baronett.[4]

---

**2.** There is an indication in plaintiff's exhibit 26 that the ship encountered inclement weather.

**3.** Free water is water that lies on the bottom of cargo tanks, and can be measured by gauging. Entrained water, in contrast, is suspended in the oil and is measured by chemical analysis.

**4.** Unfortunately, plaintiff's attorneys and its witnesses repeatedly referred to "Karavaias" without distinguishing between the father Emmanuel, who is now deceased, and the son Anastasios, who is a defendant here. As a result, it is sometimes difficult and often impossible to determine which individual was involved in par-

In this telex, Karavaias characterized the claim of water contamination as a "charade," demanded that the ship be granted immunity from arrest, and further demanded payment of freight charges by December 20, 1982. Karavaias advised that he had a lien against the cargo for the freight and demurrage, and that if his demands were not met, he would order the vessel to sail away and sell the cargo elsewhere to satisfy the lien. Pl.Ex. 46. When Sun Oil learned of the vessel's disappearance, it rejected the remainder of the cargo. Pl.Ex. 6–5B.

During the next several weeks, the Agios Nikolas remained outside territorial limits while plaintiff negotiated with the Karavaias interests for return of the cargo. Plaintiff insisted that it was not responsible for freight payment because the price it paid to Petrobras included freight charges, but Karavaias would not yield. Finally, in mid-January, Armada paid the freight demanded into a Bermuda bank account designated by counsel for defendants, and furnished a written guarantee that the vessel would not be arrested upon re-entry into the port of New York. Anastasios Karavaias executed a guarantee that the vessel would return and discharge its cargo, Pl.Ex. 27, and on January 13, 1983, the Agios Nikolas returned to port.

Surveyors went aboard immediately to measure and sample the cargo, but they could not do so because the oil had not been heated while the ship was away. Moreover, because the cargo was cold, it could not be discharged. The ship's master had to take on fresh water to steam-heat the cargo before it could be measured and discharged; he advised the surveyors that during the ship's twenty-six day absence, no fresh water, bunker fuel or provisions had been brought aboard.

On January 17th, after the cargo had been heated, a survey was conducted by representatives of the various interests. The quantitative and qualitative analyses of the cargo revealed that there was substantially less cargo on board, and substantially more sea water in that cargo, than

there had been when the vessel departed New York harbor in December. The surveyors immediately requested permission to resample the cargo in order to verify their findings, and the ship's master reluctantly agreed.

The final survey was performed on January 18th. As part of the inspection, Saybolt's surveyor examined the ship's pump rooms. There, beneath the floor plates, he found an improper connection between the vessel's cargo system and its bunker system. (Tr. at 210). On the basis of this evidence, plus calculations indicating that the Agios Nikolas could not have steamed from Rio de Janeiro to New York and then maneuvered outside United States territorial waters for twenty-six days with the quantity of bunkers allegedly on board, surveyors representing the cargo underwriters concluded that "the vessel had repeatedly transferred cargo through [the] illegal connection into its bunker tanks and replaced the pilferred [sic] cargo with water." Pl.Ex. 26 at p. 13.

The surveyors also obtained the bottled load port samples from the ship's master in order to have them analyzed. The wax seals on all of the bottles had been broken, however, and all the parties therefore agreed that no reliable readings could be taken. An analysis was performed nonetheless, and it revealed BS & W measurements of more than 2.0% in four of the five samples drawn from shore tanks in Rio de Janeiro. The bottle containing a composite of samples drawn from the ship's cargo tanks yielded a BS & W reading of 8.6%.

Upon the ship's return to New York, plaintiff leased storage space at a warehouse in Bayonne. On January 18th, the cargo was discharged from the Agios Nikolas into barges for transfer to the storage facility. The net quantity of contaminated cargo delivered to plaintiff, including the 50,000 barrels removed by barge upon the vessel's initial arrival in New York in December, was approximately 333,254 barrels. Pl.Ex. 26 at p. 19.

ticular transactions or communications. *See, e.g.,* Tr. at 275 *et seq.*

Plaintiff made efforts to sell the severely contaminated cargo, but could find no buyers. It thereafter undertook to recondition the oil by various methods, including conventional water decanting and chemical treatment. During February and March of 1983, Armada did manage to make several spot salvage sales at depreciated prices. However, it asserts that it ultimately suffered a loss reflected by the difference between the amount it would have received if the cargo had arrived sound and the amount it actually realized, plus the costs it actually incurred in recovering and reconditioning the oil cargo. Armada produced invoices, receipts and other documents reflecting such costs as legal fees, chemical decontaminants and barging fees, amounting to $1,195,879.00. According to plaintiff's calculations, its total loss amounted to $4,130,900.00.

Defendants presented only one witness at trial; he was Kenneth Graham, the president of a marine surveying company called International Marine Consultants. That organization participated in the measurement and analysis of the Agios Nikolas cargo after the ship's December arrival in and January return to the New York harbor. Through Graham, defendants attempted to establish that before departing Rio de Janeiro, the ship's master had protested the bill of lading figures. This line of questioning was met with a hearsay objection, which was sustained. Graham also discussed a survey report prepared by his company, which indicated, *inter alia*, that the excess water found in cargo samples drawn on December 15, 1982 was fresh water rather than sea water. This report concluded:

> [T]here was no sea water entry into the cargo tanks during the voyage [from Rio de Janeiro to New York], nor were there any irregularities by the vessel. Unusually high percentage of fresh water in samples could be explained either by pre-shipment condition or by defective heating system. At this point we are unable

to discuss the pre-shipment condition without access to the load port samples.

Pl.Ex. 24 at Part II, pp. 5–6.

At the close of the testimony, the parties agreed to submit post-trial memoranda. These papers were filed in due course, and the Court has reviewed them carefully. Armada urges the Court to find: (1) that it made out a *prima facie* case of liability for cargo shortage which defendants failed to rebut; (2) that it proved its claim of intentional conversion of the cargo; (3) that it is entitled to damages measured by the difference between the Sun Oil contract price and the salvage price it ultimately received, plus amounts expended in recovering, storing, reconditioning and reselling the cargo; (4) that the named corporate entities should be disregarded and that judgment should be entered against Anastasios Karavaias individually; and (5) that Armada is entitled to punitive damages.

In their opposing post-trial memorandum, defendants take issue with plaintiff's characterization of the facts established at trial. Defendants describe the facts as follows:

> On November 16, 1982, ... the S/T Agios Nikolas loaded a cargo of fuel oil in bulk without making any representations as to quality and quantity. The cargo was conveyed to the S/T Agios Nikolas via a leaky pipeline routed under the port to the loading berth.
>
> During the loading process, there were significant amounts of saltwater coming into the vessel's tanks through the leaks in this pipe. However, there was no outflow of oil from the loading pipe into the harbor to alert anyone on shore—or on the vessel—that the vessel's tanks were taking on anything but cargo.
>
> Plaintiff's obfuscations notwithstanding, it has not been able to prove the quality of the oil which was loaded at Rio de Janeiro.
>
> \* \* \* \* \* \*
>
> When the S/T Agios Nikolas docked, several surveying teams were engaged by the consignee until one was found

who would agree to the finding of water in the cargo.

With false arrest warrants lodged in Newark and a weak P & I Club unable to post bond, the S/T Agios Nikolas was forced to remain on sea trials, hovering outside the harbor.

Def. Post-Trial Mem. at pp. 1–3.

Having thus disposed of plaintiff's claim for contamination, defendants argue that they did not convert the cargo because they were "fleeing an illegal arrest as well as protecting [their] lien on plaintiff's cargo." *Id.* at 6. This contention is apparently based, in part, on defendants' suggestion that Supplemental Rule C of the F.R.Civ.P. ("Rule C"), which permits the issuance of a warrant for the arrest of a vessel, is unconstitutional because it fails to provide adequate due process safeguards. Defendants thus insist that "plaintiff is the cause of its own damages." *Id.*

Defendants argue, finally, that there is no basis upon which to impose liability against Anastasios Karavaias individually, and that punitive damages are inappropriate on the facts of this case. The parties' differing characterizations of the facts, as well as their legal arguments, are discussed below.

## Discussion

### I. Defendants' Version of the Facts

I have painstakingly reviewed the lengthy testimony and the voluminous documentary evidence received at the trial of this matter, and I have found absolutely no support whatsoever for defendants' posttrial construction of the facts. Frankly, I am appalled that experienced counsel would submit such a fictionalized account with apparent impunity. No court could find fault with an attorney who has construed disputed facts in the light most favorable to his client. However, there must be *some* evidentiary basis for a given construction, and in this case, there is not one iota of evidence which even arguably supports defendants' view.

As quoted above, counsel for defendants states that the Agios Nikolas loaded its cargo "without making any representations as to quality and quantity." I simply cannot comprehend how counsel could make this statement in the face of a clean bill of lading reflecting receipt of 348,614.572 barrels of fuel oil in good order and condition. This bill of lading was signed by an agent of the defendants and whether or not it was correct, it constitutes at least a rebuttable admission.

Defendants next assert that the cargo was loaded through a leaky pipeline, that sea water leaked in during loading, and that no oil leaked out of the pipe so the leak was undetectable. These statements of "fact" can only be described as sheer fabrications. It was clear to me during the course of the trial that defendants hoped to prove the cargo was contaminated before or during loading. However, they were entirely unsuccessful in eliciting even the slightest support for this theory from any of the witnesses with the possible exception of a surveyor named Oakley. Oakley reported the hearsay statement of a port captain in New York, who did not sail with the vessel from Rio and who apparently admitted that he had no evidence to support his leaky pipeline theory. Tr. at 206–207. Oakley went on to state that the surveyors did not believe this theory. *Id.* Not a single witness testified that there was a leak in the pipeline. Joao Barros, who was the chief of the international market section in the fuel division of Petrobras in Rio de Janeiro, testified that if there had been a leaky pipeline, it would have come to his attention because there would have been an oil spill noticeable on the water. There was no evidence to contradict this testimony, and there was no evidence to establish even the possibility that water could leak into the pipeline without oil leaking out. Common sense would suggest the contrary, because the oil in the pipeline has to be pumped under sufficient pressure to lift it up to the top of the ship's tanks.

Moreover, defendants' own witness, Kenneth Graham, testified that the excess water found in the cargo in December was fresh water instead of sea water. According to his survey report, that water was either in the cargo before loading, or it

came from leaking heating coils aboard the vessel.

Defendants also state categorically that "several surveying teams were engaged by the consignee until one was found who would agree to the finding of water in the cargo." Saybolt representatives boarded the vessel on December 9th, the day it arrived in New York. I recall absolutely no evidence, and defendants have directed me to nothing in the record, suggesting that any survey team went on board the vessel before the Saybolt representatives, and failed to find water in the cargo. This statement is apparently rank fiction.

Rule 11 of the F.R.Civ.P. is designed, in part, to deter attorneys from presenting purely fictional accounts to federal courts under the guise of factual statements. The rule provides, in pertinent part, that the signature of an attorney "constitutes a certificate by him that he has read the ... motion or other paper," and that "to the best of his knowledge, information and belief formed after reasonable inquiry it is well grounded in fact...." Rule 11 goes on to state that if a submission is signed in violation of this provision, the court, "upon motion or upon its own initiative, shall impose upon the person who signed it, ... an appropriate sanction...." The range of appropriate sanctions expressly includes an order to pay the other party the amount of reasonable expenses and fees incurred because the offending document was filed.

■ Defendants' post-trial memorandum was signed, and under Rule 11, it therefore constitutes a certificate by counsel that the statements therein are grounded in fact. I have no choice but to conclude that this document was signed in violation of Rule 11, and I therefore direct that counsel for defendants pay to plaintiffs the amount of attorney's fees and expenses reasonably incurred in preparing a response to defendants' memorandum. Counsel for plaintiff is directed to submit an itemized statement of these fees and costs within twenty days of the date of this Opinion and Order. Defendants may have twenty additional days in which to file objections.

## II. Liability

I turn, next, to consideration of defendants' contention that plaintiff failed to establish liability for shortage or contamination because it did not prove the quality and quantity of oil loaded at Rio de Janeiro. Although this assertion appears in defendants' statement of facts, it is, quite obviously, intended as legal argument. Even as argument, however, it is unsupportable.

■ As plaintiff has correctly pointed out in its memorandum, this action is governed by the United States Carriage of Goods by Sea Act of 1936 ("COGSA"), 46 U.S.C. § 1300 *et seq.* Under COGSA, a *prima facie* case of liability is established when the cargo owner proves: (1) delivery of the goods to the vessel in satisfactory condition; and (2) arrival of less cargo than was delivered and/or discharge of the goods in damaged condition. *Spencer Kellogg, Div. of Textron v. S.S. Mormacsea,* 703 F.2d 44, 46 (2d Cir.1983); *Amerada Hess Corp. v. S.S. Phillips Oklahoma,* 558 F.Supp. 1164, 1167 (S.D.N.Y.1983). Moreover, a bill of lading issued by the carrier constitutes *prima facie* evidence that the carrier received the goods as described therein. 46 U.S.C. § 1303(4); *Westway Coffee Corp. v. M.V. Netuno,* 675 F.2d 30, 32 (2d Cir.1982).

■ As mentioned several times previously, plaintiff adduced evidence that the master of the Agios Nikolas issued a clean bill of lading for receipt of 348,614.572 barrels of fuel oil. Thus, there is *prima facie* evidence of the quantity delivered. In addition, plaintiff produced a report of the cargo analysis performed by Saybolt before the vessel's departure from Rio de Janeiro, and the report indicates that the oil in both shore tanks and ship tanks was within contract specifications. There is substantial evidence demonstrating that the Agios Nikolas arrived in New York on December 9th with less than 348,000 barrels of oil on board, and that the cargo was in worse condition than when it was loaded in Rio de Janeiro.

I am satisfied, on the basis of this evidence, that Armada established a *prima facie* case of liability under COGSA. The burden then shifted to defendants to rebut plaintiff's evidence of cargo quantity or quality prior to loading or to demonstrate that the damage was not caused by their own negligence or misconduct. This they utterly failed to do.

With respect to the quantity of cargo loaded on board, defendants tried repeatedly to show a discrepancy between the bill of lading figure, which was derived from measurements taken at Petrobras's shore tanks, and the ship's figure. Defendants attempted to establish that the ship's master had protested the bill of lading figure, even though he signed a clean bill of lading. However, I sustained plaintiff's objection to any testimony or documentary evidence of the master's protest or the ship's figures on hearsay grounds, and although defendants requested and were granted an opportunity to demonstrate in their post-trial memorandum the existence of non-hearsay evidence in the record, they have not done so. There is admissible evidence of the existence of a discrepancy (Tr. at 52), but undisputed testimony from the former chief of the international market section of Petrobras's fuel division established that as between ship figures and shore tank figures, the shore tank figures are more precise because shore tanks are larger and flatter, and they do not move. For all these reasons, I accept the bill of lading figure as an accurate reflection of the number of barrels of oil loaded on board the Agios Nikolas.

Defendants have also failed to rebut plaintiff's evidence that the cargo on board was within the Sun Oil contract specifications for quality when the Agios Nikolas left Rio de Janeiro. As I indicated above, there is absolutely no evidence of a leaky pipeline between Petrobras's shore tanks and the vessel. Moreover, it is clear to me that defendants or their agents tampered with the sealed samples given to the ship's master on departure, and thereby destroyed their only hope of establishing that the analysis performed by Saybolt in Rio de Janeiro was inaccurate.

■ On the basis of the foregoing evidence, plaintiff established defendants' liability for the shortage and contamination of its cargo. I am also satisfied, for the reasons that follow, that defendants illegally converted some of the cargo and further contaminated it during the Agios Nikolas's twenty-six days of "sea trials."

Defendants do not deny in their post-trial submissions that they fled New York harbor on December 18th with most of plaintiff's cargo still on board, or that they rigged a pipeline between the ship's cargo tanks and its fuel tanks to enable the vessel to remain outside the jurisdiction until their demands were met. Instead, they attempt to justify this behavior by charging that plaintiff secured an illegal warrant, and that the ship was merely fleeing an illegal arrest. They assert, first, that Armada secured the warrant with knowledge that there was no cargo shortage or contamination when the vessel initially arrived in New York, and second, that the procedure used to obtain the warrant violated due process. Specifically, they assert that Supplemental Rule C of the F.R.Civ.P., under which the warrant was issued by the Federal District Court for the District of New Jersey, fails to provide minimum due process protections because it does not require a pre-seizure judicial review or a prompt post-seizure hearing, and it does not assure any opportunity to obtain release of the seized vessel upon posting of adequate security.

■ Having already determined that the bill of lading figure establishes the quantity of cargo put on board the vessel in Rio de Janeiro, and that there was indeed a shortage and a contamination of cargo upon the vessel's initial arrival in New York, I reject defendants' contention that the warrant was fraudulently obtained by Armada. With respect to the perfunctory assertion that the warrant was illegal because Rule C is unconstitutional, I am unprepared to make such a ruling on the basis of the arguments presented by defendants here.

The constitutionality of Rule C has been challenged before, and in the past several

years, a substantial body of case law has developed in that area. While defendants' position is not without support among federal district courts, the greater weight of the authority sustains the contrary view, and the Courts of Appeals for the Fourth and Fifth Circuits—the only circuit courts that have directly confronted the issues raised by defendants—have held that Rule C is constitutional. *See Amstar Corp. v. S/S Alexandros T.*, 664 F.2d 904 (4th Cir. 1981); *Merchants Nat'l Bank v. Dredge Gen. G.L. Gillespie*, 663 F.2d 1338 (5th Cir.1981). Moreover, in the context of challenges to the constitutionality of Rule B, which also provides for seizure pursuant to a warrant issued by *ex parte* application to the clerk of a federal court, without prior notice or opportunity to be heard, the Courts of Appeals for the Ninth and Eleventh Circuits have cited with approval the reasoning of *Amstar* and *Merchants Nat'l Bank. See Polar Shipping Ltd. v. Oriental Shipping Corp.*, 680 F.2d 627, 637 (9th Cir.1982); *Schiffahrtsgesellschaft Leonhardt & Co. v. A. Bottacchi S.A. de Navegacion*, 732 F.2d 1543, 1549 (11th Cir.1984). Nothing raised in defendants' hastily constructed argument persuades me that these courts are in error.

■ For the foregoing reasons, I conclude that the arrest warrant issued by the district court in New Jersey was valid, and that the Agios Nikolas unjustifiably absconded with a cargo belonging to plaintiff. However, while this conclusion removes any basis upon which to excuse defendants' conduct, it does not establish plaintiff's right to recover on a theory of common law conversion. In *B.F. McKernin & Co. v. United States Lines, Inc.*, 416 F.Supp. 1068 (S.D.N.Y.1976), Judge Lasker of this Court ruled that where COGSA governs the rights and liabilities between parties, the statute precludes alternative and supplementary liability under state law. In that action, the Court held that because COGSA applied to the plaintiff's claim for damages based on the defendant's delay in delivering certain cargo, the plaintiff could not also assert separate claims for common law negligence and conversion. Armada has provided this Court with no authority to the contrary, and its claim for recovery based on a theory of conversion is therefore dismissed.

Plaintiff has succeeded in establishing liability for cargo shortage and contamination, and I shall consider next how the damages should be computed and apportioned. I note before turning to that issue, however, that plaintiff has failed adequately to establish a connection between the aforementioned events and defendants Magelan, Inc. and Magelen Maritime, Inc. The Court will therefore dismiss the action as against these two entities, subject to reinstatement upon a showing of their relationship to the misconduct charged, made within twenty days of the date of this Opinion and Order.

### III. Damages

■ Armada has asserted, and defendants have not denied, that the appropriate measure of compensatory damages in this case is the difference between the amount plaintiff would have received under the Sun Oil contract and the amount it ultimately realized from salvage sales of the contaminated oil, plus costs associated with recovery and resale of the cargo.[5]

5. As a general rule, the measure of a cargo owner's recovery in cases brought under COGSA is "the market value of the goods at destination, in like condition as they were shipped, on the date when they should have arrived." *Internatio, Inc. v. M.S. Taimyr*, 602 F.2d 49, 50 (2d Cir.1979). This rule is applied where the cargo owner has purchased the goods for resale on the open market, on the ground that if the cargo had been delivered in good condition, its worth to the buyer would have been determined by the market price at the port of destination. The carrier, it is commonly said, "should not be the guarantor of the ups and downs of commodity prices." *A.L. Holden v. S.S. Kendall Fish*, 395 F.2d 910, 913 (5th Cir.1968).

The Second Circuit has recognized, however, that COGSA was not intended to displace the established common law rule that damages should compensate for actual loss, which is the loss of what the plaintiff would have had if the contract had been performed. As a result, the market value test may be discarded where a more accurate means of calculating the loss is available, *Internatio, Inc. v. M.S. Taimyr, supra,* and a plaintiff may be awarded anticipated

Armada also seeks prejudgment interest, which is awarded in admiralty cases absent exceptional circumstances. *Mitsui & Co., Ltd. v. American Export Lines, Inc.,* 636 F.2d 807, 824 (2d Cir.1981).

If the full cargo of 348,614.572 barrels of oil had been timely delivered within contract specifications, plaintiff would have received $30.55 per barrel, or a total of $10,-650,175.00. Instead, defendants delivered approximately 333,254 barrels of contaminated cargo, most of which plaintiff was subsequently able to sell at reduced prices. Plaintiff presented undisputed evidence that it received only $7,715,154.00 in gross proceeds from these salvage sales, *see* Pl.Ex. 23; thus, it lost $2,935,021.00. In addition, the Court received evidence that Armada incurred expenses of $1,195,879.00 in connection with the recovery, storage, reconditioning and resale of the cargo. *Id.* Defendants have made no attempt to challenge the accuracy of this accounting, which includes, *inter alia,* charges for barging, pumping, demurrage, chemical analysis and demulsification. Accordingly, I am satisfied that plaintiff has proven damages of $4,130,900.00 as a result of defendants' misconduct.

■■■ With respect to plaintiff's claim for prejudgment interest, I note that district courts have broad discretion in admiralty cases to determine when interest commences and what rate applies. *Independent Bulk Transport, Inc. v. The Vessel "Morania Abaco,"* 676 F.2d 23, 25 (2d Cir. 1982). I conclude that prejudgment interest in this case should run from December 10, 1981, when defendants were obligated to deliver the full cargo in good order and condition, and that such interest should be calculated on the basis of the average yield of three-month Treasury Bills from December 10, 1981 through the date of judgment. *See, e.g., Independent Bulk Transport, Inc., supra,* 676 F.2d at 27. ("Plaintiff is

entitled to the income which the monetary damages would have earned, and that should be measured by interest on short-term, risk-free obligations."); *Amerada Hess Corp. v. S.S. Phillips Oklahoma,* 558 F.Supp. 1164, 1170 (S.D.N.Y.1983).

■■■ In addition to compensatory damages and interest, plaintiff also seeks punitive damages on the ground that defendants' misconduct was willful and wanton. Defendants do not contest the availability of this remedy; in response to plaintiff's prayer for punitive damages, they merely reiterate that they were lawfully protecting their own rights when they departed New York harbor with most of plaintiff's cargo on board.

I find no basis for believing that the operators of the Agios Nikolas thought they were within their lawful rights when they fled New York harbor immediately upon learning that a warrant had issued for arrest of the vessel. Moreover, I am convinced that defendants managed to keep the vessel outside the jurisdiction only by rigging an illegal and dangerous connection between its cargo and bunker tanks, and that they took these steps for the purpose of extorting payment and other concessions from Armada, which they well knew was in a precarious position due to the state of the oil market. Obvious tampering with the bottled load port samples only further reinforces my belief that those parties responsible for managing and operating the Agios Nikolas were guilty of thoroughly reprehensible conduct, and should be punished so that others in similar circumstances will be deterred. I remain unconvinced, however, that punitive damages are available here.

COGSA makes no specific provision for an award of punitive damages. The Second Circuit Court of Appeals has suggested that such an award might be appropriate

---

profits where it has shown that this amount was, in fact, lost. *See, e.g., Pacol (Canada) Ltd. v. M/V Minerva,* 523 F.Supp. 579 (S.D.N.Y. 1981).

In this case, it would work a grave injustice to measure plaintiff's damages by the market value of the oil on the date it was delivered. I am

satisfied that had the oil not been contaminated *en route,* Armada would have received the full Sun Oil contract price for the cargo. The contract price minus the salvage price is therefore the most accurate measure of plaintiff's actual loss.

where a defendant is "guilty of gross negligence or actual malice or criminal indifference which is the equivalent of recklessness and wanton misconduct," *Seguros Banvenez S.A. v. S/S Oliver Drescher*, 761 F.2d 855, 861 (2d Cir.1985), and I recognize that the federal courts have discretion to grant such damages under their general admiralty and maritime jurisdiction. However, plaintiff has cited no Second Circuit cases actually upholding punitive damage awards in controversies governed by COGSA. This causes me some concern in light of *Cosmos U.S.A., Inc. v. United States Lines, Inc.*, 1983 A.M.C. 1172 (N.D.Cal. 1980), wherein a district court in California ruled that punitive damages are precluded by § 1304(5) of COGSA, which provides in pertinent part: "In no event shall the carrier be liable for more than the amount of damage actually sustained."

I do not doubt that punitive damages would be appropriate under the facts of this case, but as I have indicated above, I am unconvinced that such a remedy is within my discretion to award. I will therefore reserve judgment on this issue, and grant plaintiff twenty days from the date of this Opinion and Order to submit any additional authorities and arguments in support of its application. Defendants may have twenty days to respond.

## IV. Liability of Anastasios Karavaias

The only issue remaining is whether the Court should disregard the status of the corporate defendants and impose liability for the aforementioned damages on defendant Anastasios Karavaias individually. The parties agree that Karavaias was a managing partner of defendants Black Count Shipping Corporation and Black Baronett Shipping Corporation, the charterer and sub-charterer of the Agios Nikolas respectively, and that, as such, he had "the authority to direct and/or control the movements of [the vessel] and the business of the aforementioned corporations." Agreed Stmt. of Facts at ¶ 6. Plaintiff asserts that Karavaias used these corporate entities to further his own ends through illegal means:

In the present case, Karavaias used the various defendant corporations and agencies and control of the vessel to convert plaintiff's cargo for use as bunker fuel on the vessel. Seawater was deliberately introduced to replace the converted cargo. Furthermore, Karavaias held plaintiff's cargo at ransom and threatened to sell the cargo unless plaintiff agreed to pay $556,000 (which it did not owe) to an offshore bank account and guarantee the vessel immunity from arrest. The obvious reason the freight was demanded offshore was to insulate this fund from attachment by plaintiff and other creditors of Karavaias.

Pl.Post-Trial Mem. at 26. On the basis of this direct participation by Karavaias in the misconduct that led to plaintiff's losses, plaintiff argues that individual liability is appropriate.

Defendants respond that the corporations involved were created by Karavaias and his interests "for the purpose of keeping separate and apart different operations in connection with the operating of seagoing commercial vessels," and that nothing in the record "indicates that any defendant corporation was used by Mr. Karavaias as an instrument of wrong or injustice in the transaction in this suit." Def.Post-Trial Mem. at 7–8. I cannot agree.

Defendants are undoubtedly correct that, as a rule, incorporation shields shareholders, officers, managers and agents from liability arising out of corporate activities. However, where the corporate form is disregarded by the owners and managers, or where owners or managers participate directly in tortious or fraudulent conduct, corporate status may not be invoked to shield against individual liability. *See, e.g., Kirno Hill Corp. v. Holt*, 618 F.2d 982, 985 (2d Cir.1980) ("The prerequisites for piercing a corporate veil are as clear in federal maritime law as in shoreside law"—the individual defendant must have used the corporate entity to perpetrate a fraud or have so dominated and disregarded the corporate form that the corporation primarily transacted the indi-

vidual's personal business rather than its own corporate business.); *Gartner v. Snyder*, 607 F.2d 582, 586 (2d Cir.1979); *Connell v. Hayden*, 83 A.D.2d 30, 443 N.Y.S.2d 383, 402 (2d Dep't 1981) ("A director, officer or agent is not liable for torts of the corporation ... merely because of his office [but] he is liable ... for torts in which he participated or which he authorized or directed."); 19 C.J.S. Corporations § 845; 19 Am.Jur.2d Corporations § 1382.

 I am satisfied, at least with respect to Anastasios Karavaias's conduct in connection with the activities of defendants Black Count Shipping Corporation and Black Baronett Shipping Corporation, that there is sufficient evidence of fraud, intentional tort and disregard of the corporate form to impose individual liability on Karavaias as a manager and director. Although I ruled above that Armada may not maintain and recover damages under a separate cause of action for common law conversion, there is no question but that Karavaias, through his admitted control of the Agios Nikolas, embarked on a course of flagrant misconduct that included conversion, extortion, fraud and sabotage of plaintiff's property. Moreover, there is evidence in the record which demonstrates that the late Emmanuel Karavaias, who was apparently a co-founder and a co-managing partner of the defendant corporations along with his son Anastasios, directed an individual named John Sigalos to sign corporate documents and affidavits as the president of Black Count and the treasurer of Black Baronett, although Sigalos never actually held such positions. These factors, combined with defendants' failure to respond to interrogatories addressed to the relationship between Anastasios Karavaias and the corporate defendants, are sufficient to persuade me that Anastasios Karavaias should not be shielded from liability by the corporate form.

### Summary

For all of the foregoing reasons, this action is dismissed as against defendants Magelan, Inc. and Magelen Maritime, Inc., subject to reinstatement upon a proper showing made within twenty days of the date of this Opinion and Order. Defendants may submit responsive papers within twenty days thereafter. Judgment against the remaining defendants shall be entered in the amount of $4,130,900.00 plus interest as discussed above, and judgment against counsel for defendants shall be entered pursuant to Rule 11, in an amount yet to be determined. Plaintiff is directed to submit, within twenty days of the date of this Opinion and Order, an itemized statement establishing the fees and costs plaintiff reasonably incurred in preparing, filing and serving its reply memorandum, and any additional arguments in support of its claim for punitive damages. Defendants will have twenty additional days to file objections or other responsive papers.

SO ORDERED.