**In The Matter of The Arbitration Between TRANS–ASIATIC OIL LTD. S.A., As Disponent Owner of the M/V "SILVER LADY," Respondent-Cross-Petitioner,**

v.

**UCO MARINE INTERNATIONAL LTD. a/k/a Landsea Corp., As Charterer, Petitioner-Cross-Respondent.**

**No. 85 Civ. 1981 (PKL).**

United States District Court, S.D. New York.

July 31, 1985.

---

Milgrim Thomajan Jacobs & Lee, P.C., New York City, (James D. Kleiner and Leo G. Kailas, New York City, of counsel), for respondent-cross-petitioner.

Dougherty, Ryan, Mahoney, Pellegrino, Giuffra & Zambito, New York City, (Robert J. Giuffra and James E. Ryan, New York City, of counsel), for petitioner-cross-respondent.

## MEMORANDUM & ORDER

LEISURE, District Judge:

UCO Marine International Ltd. ("UCO") has petitioned the Court to vacate, pursuant to 9 U.S.C. § 10, the Final Decision and Award by the Arbitrators dated January 15, 1985 ("Award") and direct that a rehearing be had before new arbitrators. Trans-Asiatic Oil Ltd. S.A. ("Trans-Asiatic") has cross-petitioned the Court for an order, pursuant to 9 U.S.C. § 9, confirming the Award and directing entry of final judgment in its favor upon the Award, denying UCO's counterclaim, awarding interest at a compounded rate from January 15, 1985, awarding interest on the judgment sum, awarding costs, legal fees and disbursements as stipulated in the parties' agreement and awarding punitive damages in the amount of $200,000 or sanctions against UCO and its counsel.

## UNDERLYING FACTS

Briefly stated, the facts of the underlying dispute are as follows. UCO entered into a sales contract, dated May 27, 1980, with a third-party, that provided the "delivered cargo to be heated to 145° F. minimum." The sales contract specified the pour point [1] was 115° maximum. These

1. The pour point of oil is the temperature at which it begins to flow. *Amerada Hess Corp. v.*

provisions of the sales contract were not made known to Trans-Asiatic. UCO thereupon attempted to charter a vessel to transport this cargo consisting of 44,000 long tons of crude and/or dirty petroleum products. A number of vessels, including the M/V Silver Lady, owned by Trans-Asiatic, however, were unwilling to agree to the 145° F. heating requirement.

After UCO failed to find a ship capable of supplying the high heating requirement, UCO and Trans-Asiatic entered into an Asbatatank Charter Party form dated June 9, 1980 ("Charter Party") for the M/V Silver Lady to transport a load of high pour low sulphur No. 6 fuel oil from Salvador, Brazil to New York. The Charter Party states that "heat 135° F. to be maintained throughout voyage and discharge." The voyage orders stipulated that the "cargo is to be heated enroute and for arrival and discharge to a temperature of 135° F., basis a pour point on the cargo of 105° F." The voyage orders further stated that if the actual pour point exceeded 105° F. that the "Vessel do its utmost to heat the cargo enroute and for arrival and for discharge to a level of not less than 30° F. above the actual pour point on the cargo." In response to this suggested language Trans-Asiatic reminded UCO that the "Charter heating obligation was to a maximum of 135° F." Trans-Asiatic asked UCO to amend the voyage instructions to provide that "in no event is this request to be construed as a request to heat beyond a maximum of 135° F." UCO thereupon issued instructions that the ship should heat the cargo in the most economical manner for arrival temperature in New York and throughout discharge of 135° F.

After loading the cargo, the vessel sailed for New York on June 24, 1980. The cargo was heated enroute. The major part of the cargo was drawn from three shore tanks, having temperatures ranging from 156° to 159° F. A fourth tank had a temperature of 148° F. Cargo temperatures were taken daily and logged, ranging from 135° F. to 154° F. in the ship's individual tanks. No difficulties in heating were reported.

On arrival at the discharging berth in New York on July 6, 1980, pre-discharge temperatures and samples were taken. The temperatures ranged from a low of 134° F. to a high of 155° F., with an average of 143.9° F. Nevertheless difficulties were encountered in discharging the cargo with the result that 3,915 barrels remained on board. Due to the large residue, the Silver Lady sailed for Virginia to have her tanks cleaned.

Trans-Asiatic commenced arbitration to recover the costs of the cleaning operation which amounted to over $200,000. UCO counterclaimed for approximately $112,000, the value of the 3,915 barrels which were not delivered.

The arbitration panel conducted seven hearings between December 17, 1982 and May 1, 1984. Seven witnesses testified and numerous exhibits were received into evidence. The Arbitrators denied UCO's claims for non-delivery of cargo and attorneys' fees and expenses. The panel awarded Trans-Asiatic a total of $371,502.67, representing excess demurrage incurred in connection with the discharge problems and cleaning, cleaning costs, additional bunkers, and interest from August 20, 1980 to January 15, 1985 at 14.195% on the sum of $228,512.21. The Award also directed UCO to pay Trans-Asiatic $25,000 toward legal expenses, making for a grand total of $396,502.67. UCO was directed to pay the award within 30 days of January 15, failing which, interest would commence accruing on the principal sum of $228,512.21 at the rate of 10.5% until paid or reduced to judgment by a Court having jurisdiction. The Arbitration panel also allocated between the parties the costs of the arbitration.[2]

---

*SS Phillips Oklahoma,* 558 F.Supp. 1164, 1168 n. 9 (S.D.N.Y.1983) (Sprizzo, J.).

**2.** UCO allegedly has failed to remit timely all of its share of the Arbitrator's fees. Trans-Asiatic has undertaken to pay this sum and pursuant to Appendix "A" of the Award claims over against UCO for this amount, allegedly $6,000.

## THE PETITION TO VACATE

UCO petitions the Court to vacate the award on the following grounds. First, UCO alleges the Arbitrators manifestly disregarded the law by improperly allocating the burdens of proof on UCO. Second, the Arbitrators allegedly disregarded and avoided consideration of determinative facts favorable to UCO's position for which there was no evidence. In other words, the Award does not meet the fundamental test of rationality. Finally, the Arbitrators acted *ultra vires* in awarding interest on the amount awarded to Trans-Asiatic since neither the contract between the parties nor the submission agreement provided for the award of interest.

The Court's power to vacate an arbitration award is limited to the grounds set forth in 9 U.S.C. § 10. *Wilko v. Swan*, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953). Arbitrators are not required to explain their conclusions in the awards they issue. *Id.* at 436, 74 S.Ct. at 187; *Sobel v. Hertz, Warner & Co.*, 469 F.2d 1211, 1214 (2d Cir.1972). "When arbitrators explain their conclusions ... in terms that offer even a barely colorable justification for the outcome reached, confirmation of the award cannot be prevented by litigants who merely argue ... for a different result." *Andros Compania Maritima v. Marc Rich & Co., A.G.*, 579 F.2d 691, 704 (2d Cir.1978). It is not the function of the district court to review the record of the arbitration proceedings for errors of law or fact. *Saxis S/S Co. v. Multifacs International Traders, Inc.*, 375 F.2d 577, 581–82 (2d Cir.1967).

UCO's first basis for challenging the award relies upon the rule under the United States Carriage of Goods by Sea Act, 46 U.S.C. § 1300 *et seq.* ("COGSA"), that once non-delivery of cargo is established "the burden of proof is on the carrier to establish that the [loss] was not due to its negligence, or that it was occasioned by one of the 'excepted causes' listed in § 1304(2)." *Amerada Hess Corp.*, 558 F.Supp. at 1167; *Demsey & Associates v. S.S. Sea Star*, 461 F.2d 1009, 1015 (2d Cir.1972). UCO alleges that although the Arbitrators were aware of this rule they deliberately refused to apply it. Such conduct, UCO claims, amounts to manifest disregard of the law on the part of the Arbitrators. "The 'manifest disregard' standard has been construed to require a showing that the arbitrator understood and correctly stated the law but proceeded to ignore it." *A/S Siljestad v. Hideca Trading, Inc.*, 541 F.Supp. 58, 60 (S.D.N.Y. 1981), *aff'd*, 678 F.2d 391 (2d Cir.1982) (vacatur denied).

UCO claims that after it produced evidence Trans-Asiatic failed to deliver a portion of the cargo, the Arbitrators did not require Trans-Asiatic to produce evidence that the Silver Lady was seaworthy and fit to carry UCO's cargo or that Trans-Asiatic had exercised due diligence to make the ship seaworthy and fit. UCO claims that the Arbitrators thereby placed the burden of establishing unseaworthiness and lack of diligence on UCO. UCO further alleges that the Arbitrators ignored unrefuted evidence proffered by UCO demonstrating unseaworthiness and unfitness of the vessel through improper design of the vessel's heating coil system. Finally, UCO alleges that the Arbitrators failed to require Trans-Asiatic to make any showing that the loss was due to one of the excepted COGSA causes.

This argument is baseless. The Award itself states that Trans-Asiatic introduced various reports indicating that the ship was seaworthy and fit for the contracted voyage. *See* Award at 8. The Award also specifically states that UCO's "allegations that the configuration of the Vessel's coils prevented even and thorough heating of the cargo, are not supported by the evidence." *Id.* at 15.[3] The Arbitrators based

---

3. UCO has asserted as a reason for vacating the award that the Arbitrators ignored evidence presented by UCO through expert testimony that allegedly demonstrated the unseaworthiness of the vessel because its heating coil system was improperly designed. To the contrary, the Award specifically referred to the arguments asserted by UCO in this regard. Award at 11.

their decision on records presented in evidence that on subsequent voyages the ship transported cargoes which required normal heating without incident. *Id.* Finally, there was substantial evidence introduced and considered by the panel that the problem resulted from "inherent defect, quality, or vice of the goods," one of the excepted COGSA causes which relieves the carrier of responsibility for loss. 46 U.S.C. § 1304(2)(m).

With regard to this last issue concerning the quality of the cargo, the Arbitrators determined, based upon various pour points found by several laboratories, that the pour point of the cargo equalled 118.3° F. Addition of the margin of 30° F. set forth in the Charter Pary brought the temperature required for efficient discharging to 148.3 F., well above the Charter Pary requirement of 135° F. Furthermore, the panel considered other evidence which tended to support this conclusion, such as the very high temperature in the three shore tanks, the blockages of the shore line in the discharge port caused by congealing of the cargo, the difficulties experienced in stripping when the cargo dropped below the level of the heating coils and the extended efforts of the vessel to preheat the residue solids to very high temperatures in order to cause reliquification. Award at 15.

Moreover, evidence was introduced which established that UCO concealed the characteristics of its cargo. This evidence no doubt caused the Arbitrators to include in the Award a narration of the negotiating positions with respect to the Charter Party and the voyage orders in order to establish there could be no dispute that the parties agreed to a heating maximum of 135° F.

Next UCO attacks the Award as irrational. UCO claims there is no evidence to support the Panel's finding that UCO knowingly chartered a tanker with a heating capacity of 135° F. for a high pour cargo which required a minimum tempera-

ture of 145° F. *Id.* at 12. UCO labels irrational the process by which the Arbitrators decided to rely on certain of the pour point laboratory results and disregard others. This argument is meritless. The panel considered each of the pour point analyses presented in evidence and stated valid reasons why they relied on some and not on others. *Id.* at 14. Furthermore, UCO ignores the fact that the contract of sale for the cargo in question states "CARGO DELIVERED TO BE HEATED TO 145 DEG F MIN."

█ UCO next claims that the interest award was *ultra vires* the Arbitrators' authority because neither the arbitration clause in the Charter Party nor the "Submission Agreement" expressly provides for an interest award. This contention is frivolous and rejected. First, the parties never entered into and delivered a submission agreement to the panel. Second, in its post hearing brief UCO itself asked for an award of interest at 12.5% per annum from July 8, 1980 on its counterclaim. *See* Charterer's Post Hearing Brief at 32. (Trans-Asiatic, of course, also requested an award of interest in its post hearing memorandum of law.) Third, the case law and commentators recognize the power of an arbitrator to award interest. *A/S Siljestad v. Hideca Trading Inc.*, 678 F.2d 391 (2d Cir.1982) (interest award upheld based on same arbitration provision invoked in present case). *See e.g. Domke Comm. Arbitration*, § 30.-03 (Rev. ed. 1984).

For all the foregoing reasons, UCO's petition to vacate the Award is denied.

### THE PETITION TO CONFIRM

For the reasons presented above, Trans-Asiatic's petition to confirm the Award is granted. Accordingly, Trans-Asiatic is entitled to judgment on the Award, including principal amounts and interest as awarded. The judgment also includes interest on $228,512.21 at the rate of 10.5% per annum

---

The panel found persuasive, however, the findings of UCO's own surveyor that there was nothing "derogatory" about the vessel's heating equipment, *id.* at 16, and were less than impressed with the testimony of Mr. Van Rybach, UCO's expert in this regard. *See, e.g.,* Tr. at 354–55.

from January 15, 1985 until payment of the Award or until the Award is otherwise reduced to judgment, whichever occurs first. Trans-Asiatic is further entitled to recover the amount paid to the Arbitrators that represents UCO's share of the Arbitrators' fees. Trans-Asiatic shall receive interest on this sum at the rate of 10.5% per annum compounded daily accruing from the date of payment until judgment is entered. Finally, UCO's counterclaim is denied.

Trans-Asiatic has petitioned the Court for further relief. It asks the Court to issue an order awarding interest on the full amount of the award, $396,502.67 from January 15, 1985 at a compensatory rate compounded daily until entry of judgment or until payment thereon. Trans-Asiatic further requests an order directing such compound interest formula to prevail after the date of judgment on the full amount of the judgment. In addition, Trans-Asiatic asks the Court to award it costs, legal fees and disbursements as stipulated for in the Charter Party and punitive damages or sanctions against UCO and its counsel. In this regard, Trans-Asiatic has requested the Court to hold a hearing on its claim for legal fees.

The general rule in the United States is that in the absence of legislation providing otherwise, litigants must pay their own legal fees. An exception to this rule is the existence of an agreement between the parties that legal fees are recoverable. In this case Clause 23 of the Charter Party provides:

> Damages for breach of this Charter shall include all provable damages, and all costs of suit and attorney's fees incurred in any action hereunder.

Clauses 21 and 24 of the Charter Party contain additional references which indicate that the parties intended to spare a wronged party damages in the form of legal fees and costs. Trans-Asiatic has requested specifically that the Court order UCO to pay all costs of suit and legal fees incurred in this Court. In addition, Trans-Asiatic argues that based upon UCO's past

dilatory practices and the very real possibility it will pursue its appellate remedies, that the judgment direct UCO to pay all costs and legal fees incurred hereafter in this Court and elsewhere in enforcing the Award against UCO.

Trans-Asiatic has also moved under Rule 11 for the imposition of sanctions against UCO and its counsel on the grounds that the petition to vacate the award was interposed in bad faith and merely for the purposes of delay. On this basis the Court should assess the costs and legal fees incurred in opposing the petition and pursuing the cross-petition. *Cf. A/S Siljestad v. Hideca Trading Inc.*, 678 F.2d 391, 393 (2d Cir.1982).

■ Trans-Asiatic's request for an order awarding interest on the full amount of the award from January 15, 1985 until judgment and that interest on this amount be compounded daily is denied. The Award reflects deliberation and care on the part of the Arbitrators in framing the relief granted and under the circumstances it would not be appropriate for the Court to modify the Award in this regard. Trans-Asiatic's request for an award of attorneys' fees pursuant to Clause 23 of the Charter Party is granted. Trans-Asiatic shall recover all court costs and reasonable attorneys' fees incurred by reason of opposing the petition to vacate the Award and in support of the cross-petition to confirm the Award. In addition, in the event this Order is appealed or made the subject of a motion to reconsider, or if there is any further litigation with regard to the Award or this Order, the prevailing party shall be entitled to recover court costs and reasonable attorney's fees incurred by reason of such further proceedings.

Trans-Asiatic's request for an award of sanctions pursuant to Fed.R.Civ.P. 11 against UCO and its counsel is denied.

## CONCLUSION

UCO's petition to vacate the Award is denied. Trans-Asiatic's petition to confirm the Award is granted. On or before Au-

gust 15, 1985, Trans-Asiatic shall serve and file affidavits and any appropriate documents in support of its claims for costs and attorneys' fees incurred in this Court. These papers should also include a request for the amounts paid by it to the Arbitrators representing UCO's share of the Arbitrators' fees. UCO shall serve and file on or before August 30, 1985 its papers, if any, in opposition to the amounts claimed by Trans-Asiatic.

SO ORDERED.