**NEW ENGLAND PETROLEUM CO., Plaintiff,**

v.

**O.T. SONJA, her engines, boilers, tackle, etc. in rem and O.T. Shipping Ltd. of London, Defendants.**

**No. 86 Civ. 1308 (BN).**

United States District Court, S.D. New York.

March 13, 1990.

Hill, Betts & Nash, New York City, for plaintiff; Kenneth Geller, of counsel.

Walker & Corsa, New York City, for defendants; Lenore E. McQuilling, of counsel.

## OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

NEWMAN, Senior Judge of the United States Court of International Trade, sitting by designation:

### INTRODUCTION

Plaintiff New England Petroleum Co. ("NEPCO") commenced this admiralty action seeking to recover damages in the amount of $99,489.71 plus interest from defendant O.T. Shipping Ltd. of London ("Owner") for non-delivery of 4090 barrels of No. 6 fuel oil (the "Cargo") from an ocean shipment of 204,933 bbls., evidenced by a clean on board bill of lading. Defendant denies liability for non-delivery and disputes the amount not delivered.

The court has admiralty and maritime jurisdiction of this matter pursuant to 28 U.S.C. § 1333 (1982). The following constitutes the court's findings of fact and conclusions of law in accordance with Fed.R. Civ.P. 52(a).

### FINDINGS OF FACT

In January 1986 NEPCO through its affiliate Charter Marine Transportation Co. ("Charterer"), contracted with defendant by charter party agreement, *see* Defendant's Exhibit B ("DX *n* "), to charter the O.T. SONJA (the "Vessel") to transport a cargo of No. 6 fuel oil, dirty petroleum which plaintiff had purchased from SELM S.p.A. (the "Seller"), from the port in Priolo, Italy to the United States. Agreed Fact 3,6 ("AF *n* "). Payment was made by NEPCO to SELM pursuant to a letter of credit through Banque Paribas (Suisse) S.A. in the amount of $4,610,992.50 or $22.50 per barrel, exclusive of freight. AF 17–18. The freight charged by the Vessel for transporting the Cargo was $1.82 per barrel. AF 19.

The relevant clauses of the charter party agreement read in pertinent part:

### Special Provisions

(a) 2. Cargo.... Vessel to maintain loaded temperature but maximum 135 [degrees Fahrenheit]. If Charterers request raising temperature[,] Owners to raise temperature as per Charterer's instructions, but maximum 15 [degrees Fahrenheit] ... but Owners not required to raise temperatures above 135 [degrees Fahrenheit].

(b) 7. Amoco Cargo Retention Clause.... Owners warrant pumps are capable of discharging .3 low sulphur fuel oil hi-pour cargo.

(c) 21. Stripping/draining.... Charterer at its option may detain the Vessel at the discharge point to improve stripping/draining of cargo tanks.

DX B at 11, 16.

Main clause 10 of the agreement states, "[t]he cargo shall be discharged from the Vessel at [Owner's] risk only up to the Vessel's hose connections." *Id.* at 5. In accordance with the charter party agreement, the Vessel was instructed by the Charterer to maintain the Cargo at its loaded temperature or 135 degrees, whichever was higher. AF 13.

Before the Cargo was loaded, the vessel's tanks were gauged and inspected by Van Der Hoeven Consultants S.r.1., Marine Bulk Oil Surveyors ("Van Der Hoeven") and found to contain no on board quantity

(O.B.Q.).[1] AF 11; Plaintiff's Exhibit 3 at 5 ("PX *n* "). The Vessel's chief officer confirmed this finding. AF 12. An analysis of the Cargo in Italy revealed that it had a pour point of 109 degrees fahrenheit, a sulphur content of .3 percent by weight, A.P.I. gravity of 22.54 at 60 degrees fahrenheit, viscosity of 80.2 ssf at 122 degrees fahrenheit and a BS & W content of .2 percent by volume. PX 3 at 3; DX M; AF 14, 24.[2] The Cargo is described as a low sulphur No. 6 fuel oil, the type which required heating during the voyage. Tr. 18–19.

The certificate of weight from the Van Der Hoeven Survey Report reveals that after loading there were 204,933 bbls. aboard the Vessel, the quantity stated in the bill of lading. PX 3 at 9; PX 25. Defendant's ullage report, however, states an amount loaded of 204,766 bbls., a difference of 167 bbls. AF 34; DX C at 9. As a result, the Master of the Vessel issued a letter of protest regarding the difference and agreed to sign the Cargo documents under protest.

Regarding this difference, the court notes a discrepancy in the Van Der Hoeven Survey Report between the amount of Long Tonnage recorded in the ullage report and the amount reported on the certificate of weight. PX 3 at 7, 10; *see also* AF 30 (discussing the difference in *metric tons* between the ship's loading figures and the bill of lading). Specifically, the ullage report states 29,375.295 Long Tons as the quantity on board according to ship's ullages and tables, whereas the certificate of weight states 29,385.896 Long Tons, a difference of 10.6 Long Tons. Using the Long Tons per Barrel conversion chart, *see* PX 38, and interpolating for an A.P.I. grav-

ity of 22.54 at 60 degrees fahrenheit, reveals a difference of over 167 bbls. The court thus finds, using ship's figures, the Vessel's ullage figure of 204,766 bbls. as the more accurate figure reflecting the amount of Cargo actually loaded in Priolo, Italy. Additionally, it should be noted NEPCO reserved its rights against the Seller concerning this discrepancy.

The Vessel departed Italy on January 16, 1986. According to the engine log, the overhaul of the feedwater transfer pump had just been completed.[3] *See* DX S (engine log entry dated 1/16/86). Significantly, on January 18, 1986 the feedwater pump necessarily had to be dismantled for another complete overhaul. *Id.* Again, on January 21, 1986 the feedwater pump was in need of repair. *Id.;* and subsequently, on January 28, 1986 the Vessel "stopped heating of cargo tanks due to extensive feedwater leak." *Id.* (deck log entry dated 1/28/86). Twenty hours later, on January 29, 1986 the Vessel resumed heating of the cargo tanks, only to halt again the following morning "due to loss of all feedwater." *Id.* There is no evidence that the Vessel ever resumed heating of the Cargo until discharge.

Defendant contends that the Vessel maintained a temperature of 135 degrees fahrenheit for a majority of the voyage. DX HH. But importantly, an examination of the Vessel's oil record book reveals that while the average Cargo temperature was maintained at 135 degrees fahrenheit, or more, for the first nine days of the voyage, nevertheless during the remaining six days and in the crucial period after defendant stopped heating the cargo, the average Cargo temperature dropped precipitously

---

1. O.B.Q. refers to the amount of residual cargo from a previous voyage. Tr. 27; AF 11. Stated in layman's terms, this means simply that before loading the Cargo, the Vessel's tanks were completely empty.

2. Pour point is defined as the lowest point at which a liquid will flow. Tr. 16.

 A.P.I. gravity refers to a cargo's density and is used principally for making volume corrections. Tr. 157–58; *see, e.g.,* PX 32. (A.P.I. is the abbreviation for American Petroleum Institute. Tr. 248.)

Viscosity is a liquid's resistance to flow, the constancy of which may change with a change in temperature. Tr. 134, 162–66.

BS & W signifies bottom, sediment and water and refers to the dregs contained within a cargo. Tr. 158.

3. Feed water is used to generate steam to heat the cargo. Tr. 34, 260. Without feedwater, it is impossible to operate the boiler used to heat the Cargo. Tr. 263.

to 124 degrees fahrenheit, well below the heating requirement specified in the charter party agreement.

Defendant argues, however, even if this is so, it had no practical effect on the discharge efficiency of the cargo; and that having a pour point of 109 degrees fahrenheit, the oil would have reached absolute viscosity [4] at a temperature of 122 degrees fahrenheit and would, at that temperature, be completely liquid.

In this aspect defendant's expert testified that even if the Cargo had been heated to 135 degrees fahrenheit, it would not have had an effect on the discharge. Tr. 175–76, 247. Plaintiff's expert Captain Peter Selenikas, on the other hand, testified that the Cargo aboard the Vessel had to be heated or it would solidify Tr. 18–19. Continuing Captain Selenikas emphasized that based on his experience, if the Vessel stopped heating the Cargo "[f]or a long period of time ... for a few days, definitely some of the cargo below the heating coils would be solidified," and there would be excess clingage. Tr. 35. More importantly, Captain Selenikas stated that reheating the Cargo would not immediately make it liquid. Tr. 70.

On this point, the court finds plaintiff's expert testimony more credible.[5] This conclusion is supported by the Charterer's Surveyor's Report, see DX W at 5 (noting that, after stripping, the two to three inch crust remaining on the tanks resulted from a failure to heat the cargo), and buttressed by defendant's own expert, who conceded on cross examination that it is difficult to reheat solidified petroleum. Tr. 251.

4. Absolute viscosity is the point at which relative to an increase in temperature there is no longer a corresponding change in viscosity. This simply means the more the oil is heated, the more liquid (less viscous) it becomes, up to a certain point. After that point, it does not matter how much the oil is heated; it does not become any less viscous. Tr. 162–66; DX JJ.

5. Captain Selenikas testified that as Operations Manager for Amerada Hess, a major supplier of No. 6 fuel oil, and during his 37 years in the industry, he has personally supervised the discharge of over 500 cargoes of heated No. 6 fuel oil *in New York during the winter months.* Tr. 14 (emphasis added).

On February 1, 1986 the Vessel berthed at Con Edison's Hudson Avenue Terminal in Brooklyn, New York. Upon arrival plaintiff's surveyors Caleb Brett USA, Inc. ("Caleb Brett") and Stephen J. Makowski Associates, Inc. ("Makowski") inspected the cargo tanks, gauged the Vessel and measured the Cargo temperature in each of the tanks. Both the Caleb Brett and Makowski surveyors noted the Cargo had solidified and formed a crust on the Vessel's tanks, and in order to obtain accurate temperature and ullage readings it was necessary to break the crust with (it is unclear) either a $2'' \times 4''$ section of timber or an iron bar. See DX W at 1; PX 30.

Caleb Brett measured the temperature in the cargo tanks, which ranged from 124.5 to 144.2 degrees fahrenheit. AF 23. In addition, ullage readings indicate the Vessel arrived at the Con Edison Terminal with 204,305 bbls. aboard. AF 34; PX 1 at 5; DX C at 2. The difference between the amount after loading in Italy (204.766 bbls.) and before discharge in New York (204,305 bbls.) constitutes an in-transit loss of 461 bbls. AF 34. Consequently, Caleb Brett issued letters of protest concerning both defendant's failure to maintain the Cargo temperature in conformance with the charter party agreement and the in-transit loss. PX 1 at 10, 12.

Regarding the in-transit loss, the court finds defendant's expert testimony convincing on this point, that the loss is not a real loss but rather a "paper" loss, resulting from various changes in A.P.I. gravity, temperature, and BS & W content. Tr.

Defendant's expert Captain Manuel Rodriguez testified that he supervised the very first discharge of low sulphur waxy fuel oil at the Con Edison Terminal in Brooklyn, New York in 1968. Tr. 149, 213. However, from 1973 to present, Captain Rodriguez has had no experience with a No. 6 fuel oil with a pour point (as in this case) of 109 degrees fahrenheit; indeed, most of his experience has been with No. 6 fuel oil with a pour point ranging from 30 to 60 degrees fahrenheit. Tr. 239–41. Significantly, on cross examination, when asked about his experience concerning R.O.B. quantities for No. 6 fuel oil at the Con Edison Terminal, Captain Rodriguez replied, "This was so look [sic] ago, I wouldn't recall." Tr. 261.

159–62. Thus, upon arrival in New York the Cargo had the following characteristics: A.P.I. gravity of 22.4 and a BS & W content of .1 percent by volume. PX 23. Defendant's expert testified that in terms of volume, a change in A.P.I. gravity from 22.54 to 22.4 would account for 176 bbls. of oil. Tr. 204; *compare* PX 23 *with* PX 3. Experts for both parties agreed that the .1 percent change in BS & W would account for approximately 200 bbls. Tr. 49–50, 160–61.

The Vessel discharged its Cargo into two shore tanks at the Con Edison Terminal. Some of the Cargo had to pass through a seven mile underwater pipeline to reach Con Edison's shore tank facility at 14th Street in Manhattan. DX W at 1. No line displacement test was ever performed, however, to determine the quantity of oil in the submarine line. *Id.;* DX C at 2. Because a line displacement test was not performed, it is impossible to ascertain the quantity of oil in the pipeline prior to the pumping of the Cargo through the pipeline. Hence, it cannot be determined whether any portion of plaintiff's Cargo remained in the pipeline after completion of discharge.

The quantity received by Con Edison was based on these shore tank readings and amounted to 200,842 bbls. Thus the difference between the quantity of cargo measured aboard the Vessel prior to discharge (204,305 bbls.) and the amount Con Edison received in its shore tanks (200,842 bbls.) equals 3463 bbls. NEPCO sold the Cargo to Con Edison for a market value of $4,255,954.10 or $21.19 per barrel. ($4,255,954.10 ÷ 200,842.14 bbls. = $21.19/bbl.) DX FF.

At discharge, the Cargo was heated as high as 150 degrees fahrenheit and the tanks were stripped twice until it was clearly heard that the pumps took air. DX O [6]. Plaintiff's surveyor Makowski requested that the Vessel strip the cargo tanks a third time because the center tanks that were remeasured after the second stripping showed an increased residual rundown of 3–5 centimeters collecting in the after sections, DX W at 4; the ship's captain, however, refused to honor this request, stating it would be "useless and [ ] would delay his scheduled sailing time...." *Id.*

After completion of discharge, the surveyors for both parties performed an R.O.B. survey to measure the amount of Cargo that remained on board the Vessel.[7] The R.O.B. was apportioned between that regarded as pumpable and unpumpable, *i.e.,* capable of being pumped ashore by normal ship equipment. As might be expected, the R.O.B. quantity reported differs for each surveyor.

The findings of the three surveyors follow:

| SURVEYOR | NON–LIQUID | LIQUID/PUMPABLE | TOTAL |
|---|---|---|---|
| Makowski | 447 bbls. | 495 bbls. | 942 bbls. |
| Caleb Brett | 447 bbls. | 804.47 bbls. | 1251.47 bbls.[8] |
| SeaSpan | 1189.86 bbls. | 0 bbls. | 1189.86 bbls. |

Defendant's Post Trial Brief at 15.

---

Significantly, as part of the addendum to its original report, Caleb Brett indicated the R.O.B. quantity reported after discharge represented bottom clingage only and one can reasonably conclude that *a similar quantity* of clingage attached to

6. 65 degrees centigrade is equal to approximately 150 degrees fahrenheit (based on the formula Fahrenheit = $\frac{5}{9}$ Celcius + 32 degrees). DX HH.

7. R.O.B., *i.e.,* Remaining On Board, is the amount of cargo that remains on board at the conclusion of discharge. Tr. 28. R.O.B. is determined by measuring the innage or ullage of a vessel's tanks and using a calibration table prepared by naval architects to quantify such measurements. *Id.;* Tr. 124–27.

8. Caleb Brett amended its original calculation of 1425 bbls R.O.B., *see* PX 1 at 11, because of an error made in calculating the dimensions of tank No. 7. The present figure of 1251 bbls. has been stipulated by the parties. Tr. 98.

the bulkheads and internal structure of the Vessel's cargo tanks. PX 30 at 2 (emphasis added). Moreover, plaintiff's expert opined that this amount of structural clingage could be even higher. Tr. 44–46; PX 41.

After completion of discharge in New York, the Vessel sailed directly to Huelva, Spain. Prior to the loading of new cargo at Huelva, an O.B.Q. survey was conducted by Saybolt–Comismar S.A. ("Saybolt"), marine bulk oil surveyors. The Vessel's cargo tanks were gauged and found to have 393 cubic meters or 2,473 bbls of O.B.Q. PX 20.[9] Of that amount, 40 cubic meters or approximately 255 bbls. comprised engine slops which does not constitute R.O.B. from the previous voyage. Tr. 193. The parties agree that O.B.Q. is the reverse of R.O.B., i.e., the R.O.B. from the preceding voyage becomes the O.B.Q. for the succeeding voyage. AF 28.[10]

As stated, at Huelva defendant took on new cargo. Plaintiff introduced shore figures evidencing a difference of 5014 bbls. between the amount of cargo the Vessel reported receiving at Huelva and the amount the terminal stated it delivered.

PX 43; see also Plaintiff's Post Trial Brief, Appendix A (for an explanation of the conversion of metric tons to bbls.) This gross figure, plaintiff asserts, represents the Cargo which the Vessel failed to discharge in New York. The resulting anomaly is that the 5014 bbls. discrepancy is a much higher figure than plaintiff's claimed loss of 4090 bbls. To account for this discrepancy, plaintiff reasons, the court must multiply the gross figure by the Vessel experience factor to obtain a net difference of 4,345 bbls., an amount which more closely resembles plaintiff's claimed loss. Id. at 7.[11]

Defendant insists, on the contrary, that application of the Vessel's experience factor should have applied to the Vessel's figure at completion of loading in Priolo, Italy and would have resulted in a determination that the actual amount of cargo loaded in that port was 204,006 bbls. Because plaintiff cannot use shore figures from a subsequent load port to determine its loss, see discussion infra, the court cannot apply the Vessel experience factor to the shore figures from Huelva. Furthermore, it would be disingenuous for plaintiff

9. A cubic meter is the equivalent of 6.2898 bbls. AF 29. Another surveyor, SGS, reported O.B.Q. of 375 cubic meters or 2358 bbls. but did not report any engine slops. DX I.

10. Defendant contends that although the O.B.Q. generally equates with the R.O.B. from the previous voyage, the comparative measurements here are inexact due to a variety of factors, chief among them, differences in the trim of the Vessel at the different ports. Trim is the difference in length between the draft of the bow and the draft of the stern. Draft, in turn, is how deep the bow and stern submerge below the water line. For example, if a vessel has a forward draft of 10 feet and an after draft of 18 feet, the resulting trim would equal 8 feet by the stern. Tr. 25–27; see also PX 40. In this case, defendant maintains, the difference in trim between the R.O.B. surveys performed in New York and the O.B.Q. surveys performed at the subsequent load port accounts for the resulting discrepancy between the New York R.O.B. and Huelva O.B.Q. Tr. 190. Defendant presented no evidence, however, other than conjecture, that the difference in trim at the different load ports resulted in the O.B.Q. at Huelva being different from the R.O.B. in New York. In fact, defendant's expert agreed that in analyzing cargo losses it is common practice to look to the next

loadport to ascertain what the O.B.Q. was on arrival. Tr. 252. Moreover, both the Caleb Brett report and plaintiff's expert were of the opinion that the amount of structural clingage could be equal to or higher than the initially reported R.O.B. of 1251 bbls., which represented "bottom" clingage only. Tr. 44–46; PX 30. In light of all the facts and circumstances, the court finds the foregoing to be the more plausible explanation for what happened to the oil; especially considering that when all the numbers are tallied, plaintiff's loss works out to be approximately 2400 bbls. of oil, which is roughly twice the amount of R.O.B. as reported by Caleb Brett as bottom clingage and the same amount that the Vessel ultimately discharged as excess cargo at Immingham, England. See discussion infra; PX 21; see also Defendant's Post Trial Reply Memorandum at 12–13 for a detailed explanation of the comparison figures at Immingham.

11. The Vessel experience factor as calculated by Caleb Brett is .99629. AF 31; PX 1 at 13. It is determined by comparing shore figures to ship figures for previous loads. See Deposition of Rollie Caabay, inspector for Caleb Brett, at 14–15. "[T]o apply the vessel experience factor, [ ] multiply the total arrival figure of the ship ... by the vessel experience factor." Id. at 16.

to argue that the Vessel experience factor should only be applied to the Vessel after being loaded at Huelva. Accordingly, defendant's contention has merit, and the court finds that the failure to apply the Vessel experience factor to the bill of lading figure [12] $(204,933 \times .99629 = 204,172)$ at Priolo, Italy accounts for 761 missing bbls. of oil.

From Spain, the Vessel sailed to its final discharge point at Immingham, England. A comparison of the shore-quantity-loaded-at-Huelva figure (179,567 bbls.) to the shore-quantity-discharged-at-Immingham figure (181,995 bbls.) reveals that approximately 2400 bbls. of additional cargo which was loaded at Huelva was discharged from the Vessel at Immingham. PX 21; DX BB; *see also* Defendant's Post Trial Reply Memorandum at 12–13. After completion of discharge at Immingham, a "Dry Certificate" was issued, indicating that the R.O.B. was "nil." DX Z. Thus the Vessel finished as she started in Priolo, Italy, with no O.B.Q., *i.e.,* completely empty.

## CONCLUSIONS OF LAW

### I

■ Under the Carriage of Goods by Sea Act ("COGSA" or "Act") 46 U.S.C.App. §§ 1300 *et seq.* (1982 & Supp. V 1987) every bill of lading, including bills of lading issued pursuant to a charter party agreement, is subject to the Act, *Joo Seng Hong Kong Co. v. S.S. Unibulkfir,* 483 F.Supp. 43 (S.D.N.Y.1979); *but see Larsen v. A.C. Carpenter, Inc.,* 620 F.Supp. 1084, 1106–10 (E.D.N.Y.1985) (holding that COGSA may not govern where a bill of lading has been issued which incorporates by reference a charter party agreement), *aff'd mem.,* 800

F.2d 1128 (2d Cir.1986).[13] More, it is well settled that a cargo owner's *prima facie* case for non-delivery is established upon receipt by the carrier of goods described in a negotiable bill of lading and subsequent failure by such carrier to deliver the entire amount received or deliver the goods in damaged condition. *Sony Magnetic Products, Inc. v. Merivienti O/Y,* 863 F.2d 1537, 1539 (11th Cir.1989); *M. Golodetz Export Corp. v. S/S Anja Lake,* 751 F.2d 1103, 1109 (2d Cir.), *cert. denied,* 471 U.S. 1117, 105 S.Ct. 2361, 86 L.Ed.2d 261 (1985); *Spencer Kellog v. S.S. "Mormacsea",* 703 F.2d 44, 46 (2d Cir.1983).

■ Since defendant acknowledged receipt of the goods in the amount of 204,933 bbls. under the bill of lading, and because the court finds that 4090 bbls. were not delivered, the court concludes that plaintiff has established a *prima facie* case for non-delivery. Under COGSA, the burden then shifts to defendant to prove the loss was not the result of its negligence, or that it qualifies for one of the exceptions listed in § 1304(2). *O'Connell Mach. Co. v. M.V. "Americana",* 797 F.2d 1130, 1133 (2d Cir. 1986); *Madow Co. v. S.S. Liberty Exporter,* 569 F.2d 1183, 1185 (2d Cir.1978); *Demsey & Assoc. v. S.S. Sea Star,* 461 F.2d 1009 (2d Cir.1972); *Trans–Asiatic Oil Ltd. S.A. v. UCO Marine Int'l Ltd.,* 618 F.Supp. 132, 135 (S.D.N.Y.1985).

Defendant raises three such COGSA defenses: (1) plaintiff's loss resulted from an act or omission of the shipper or owner of the goods, 46 U.S.C.App. § 1304(2)(i); (2) non-delivery was the result of an inherent vice of the Cargo, § 1304(2)(m); and (3) plaintiff's loss was the result of plaintiff's own negligence, or that of its its agents or servants. § 1304(2)(q).[14]

**12.** Plaintiff argues that the Vessel experience factor should be applied to the ship's ullage figure at completion of loading $(204,766 \times .99629 = 204,006)$, but the difference between the ship's ullage figure and the bill of lading has already has been taken into account by the court. To apply the factor to that figure, would be to count twice.

**13.** The bill of lading in this case incorporates the charter party agreement, which under terms of the Clause Paramount, "shall have effect subject to the provisions of the Carriage of Goods

by Sea Act...." DX B at 6. *Nissho–Iwai Co. v. M/T Stolt Lion,* 617 F.2d 907, 913 (2d Cir.1980); *Kerr McGee Refining Corp. v. M/V La Libertad,* 529 F.Supp. 78, 82 n. 3 (S.D.N.Y.1981).

**14.** 46 U.S.C.App. § 1304(2)(i), (m) and (q) read as follows:

(2) Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from—

Defendant has demonstrated to the satisfaction of the court that part of the loss quantum is attributable to plaintiff's omission in applying the Vessel experience factor to the shipment at the load port in Priolo, Italy. Further, part of the loss is attributable to shipper's agent, Van Der Hoeven, issuing a certificate of weight which, while in accord with the bill of lading, was not in accord with its own ullage measurements taken aboard the Vessel.

■ Once the defendant raises the defense of inherent vice, the burden shifts back to plaintiff, to prove by a preponderance of the evidence, that the goods were delivered in good condition or that the damage was caused by the carrier's negligence and not by any inherent vice of the cargo. *O'Connell Mach. Co.*, 797 F.2d at 1133; *Caemint Food, Inc. v. Brasileiro*, 647 F.2d 347, 355 & n. 5 (2d Cir.1981). In connection with this burden, plaintiff need not introduce direct evidence that the Cargo was in good condition when shipped; plaintiff may meet its burden by showing, as was done in this case, *"from the condition of the cargo as delivered,* ... that the damage was caused by the carrier's negligence and not by any inherent vice of the Cargo." *Vana Trading Co. v. S.S. "Mette Skou"*, 556 F.2d 100, 105 n. 8 (2d Cir.), *cert. denied,* 434 U.S. 892, 98 S.Ct. 267, 54 L.Ed.2d 177 (1977) (emphasis added); *see also M. Golodetz Export Corp.*, 751 F.2d at 1109; *Nissho–Iwai Co. v. M.T. Stolt Lion*, 617 F.2d 907, 912 (2d Cir.1980); *M. Prusman Ltd v. M/V Nathanel*, 670 F.Supp. 1141, 1144 (S.D.N.Y.1987).

Inherent vice is defined as " 'the unfitness of goods to withstand the ordinary incidents of the voyage, given the degree of care which the shipowner is required by contract to exercise in relation to those

goods....' " *Larsen v. A.C. Carpenter, Inc.*, 620 F.Supp. at 1113 (quoting *Midwest Nut and Seed Co. v. S.S. Great Republic*, 1979 A.M.C. 379, 384 (S.D.N.Y.)). In this case, defendant has established in part the defense of inherent vice, insofar as the court has determined that part of the loss can be attributed to the nature of the Cargo, *i.e.*, the in-transit loss which resulted from various changes in A.P.I. gravity, temperature and BS & W content. This loss would have occurred notwithstanding defendant's failure to heat the Cargo.

■ Plaintiff, in turn, has met its burden by demonstrating that defendant's negligence in its failure to heat the Cargo pursuant to the charter party agreement was a concurrent cause of the loss. The evidence leaves no doubt that the breakdown of the feedwater transfer pump caused the Vessel to stop heating its cargo tanks, and it was this failure to heat the Cargo which caused plaintiff's loss. As stated in *Atlantic Banana Co. v. M.V. "Calanca"*, 342 F.Supp. 447, 451 (S.D.N.Y.1972), *aff'd mem.*, 489 F.2d 752 (2d Cir.1974), "[a]n ocean carrier is required to know the special characteristics of a cargo it accepts for carriage." The tendency of No. 6 fuel oil to congeal if not properly heated does not, as defendant contends, constitute an inherent vice; it merely requires that the carrier properly care for the Cargo. 46 U.S.C.App. § 1303(2).[15] Moreover, defendant's refusal to restrip the Vessel's cargo tanks upon request, contrary to the contract agreement, is a clear violation of the defendant's duty to properly care for and discharge the cargo.

Defendant contends that since part of the R.O.B. was in an unpumpable state, it should be relieved of liability for that por-

(i) Act or omission of the shipper or owner of the goods, his agent or representative;

\* \* \* \* \* \*

(m) Wastage in bulk or weight or any other loss or damage arising from inherent defect, quality, or vice of the goods;

\* \* \* \* \* \*

(q) Any other cause arising without the actual fault and privity of the carrier and without the fault or neglect of the agents or servants of the carrier, but the burden of proof shall be

on the person claiming the benefit of this exception to show that neither the actual fault or privity of the carrier nor the fault or neglect of the agents or servants of the carrier contributed to the loss or damage.

**15.** Section 1303 reads in pertinent part as follows:

(2) The carrier shall properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried.

tion of the Cargo which the Vessel could not deliver. In an almost identical case, *Amerada Hess Corp. v. S.S. Phillips Oklahoma,* 558 F.Supp. 1164, 1167–68 & n. 6 (S.D.N.Y.1983),[16] Judge Sprizzo noted that because defendant's negligence in transporting and discharging the cargo caused the oil to congeal, "defendant cannot escape liability by complaining that it could not discharge the cargo because it was unpumpable." Consequently, the court holds that defendant is liable for the total amount of R.O.B.

Defendant further urges that plaintiff's loss was the result of a failure to perform a line displacement test. Under COGSA § 1304(2)(q), the burden of proof relative to this issue rests squarely on defendant. Granting that it is impossible, without such a test, to determine what quantity of the Cargo remained in the pipeline, the short of the matter is defendant presented no evidence that any of the Cargo in fact remained in the pipeline. On the contrary, the weight of the evidence indicates that most of the Cargo remained on board the vessel as R.O.B. and structural clingage. Accordingly, the court concludes that defendant has failed to meet its burden with respect to this contention.

## II

■ Having established that defendant's negligence caused a substantial portion of plaintiff's loss, the final burden rests with the Owner to show what "ascertainable amount of the damage" was owing to any occurences which excepted it from liability. *M. Golodetz Export Corp. v. Lake Anja,* 751 F.2d at 1111; *Vana Trading Co. v. S.S. "Mette Skou",* 556 F.2d at 105. If defendant cannot segregate the damages into those for which it is and is not responsible, defendant shall be liable for the entire loss. *Id.*

In connection with establishing plaintiff's loss, the court notes the parties stipulated that all Cargo measurements, and thus plaintiff's loss, must be based on ship figures. AF 33. Moreover, because the charter party agreement makes the Owner liable only up to the Vessel's hose connections, the court concludes that delivery was completed at the outturn and consequently evidence of shore measurements at a subsequent load port are "irrelevant." *Insurane Co. of N. Am. v. S.S. "Globe Nova",* 820 F.2d 546, 548 (2d Cir.), *cert. denied,* 484 U.S. 965, 108 S.Ct. 454, 98 L.Ed.2d 394 (1987). "Courts give various reasons for this result, including that it is unfair to require the shipowner to inspect and be responsible for the shore facilities." *Id.* (citations omitted.) Hence, plaintiff cannot rely on shore measurements taken at Huelva to establish proof of damages or to rebut any such evidence proffered by defendant in its segregation of damages. Plaintiff's use of the Vessel experience factor, therefore, to explain the excess cargo loaded at Huelva cannot be credited. Either party may, however, use the ship O.B.Q. figure at Huelva. The reason for this is clear: The O.B.Q. is merely the R.O.B. from the previous port. In addition, it is also clear that because the figures are from a *previous* port, defendant is justified in applying the Vessel experience factor to load port figures at Priolo, Italy.

The court is convinced, after having heard all the testimony, having reviewed the trial transcript and having studied all the exhibits, that the loss suffered by plaintiff is a result of defendant's negligence in its failure to heat the Cargo. Concomitant to that conclusion, however, the court is also convinced that defendant has explained in sufficient detail what happened to portions of the Cargo along the route.

It has been recognized that measurement of vessel tank quantities "is better charac-

---

**16.** In *Amerada Hess,* as in this case, defendant cited and that court refused to follow a number of arbitration decisions ruling that a carrier's duty to deliver does not extend to liquid cargo in an unpumpable state. 558 F.Supp. at 1167 n. 6. This court recognizes the limited precedential value of such awards, which, in light of the court's reasoning, are irrelevant to the present action. *Cf. Fried, Krupp, GmbH v. Carriers, Inc.,* 674 F.Supp. 1022, 1030 (S.D.N.Y.) (Arbitrators are not required to explain the reasons for their conclusions), *aff'd mem.,* 838 F.2d 1202 (2d Cir.1987); *Trans–Asiatic Oil Ltd. v. UCO Marine Int'l Ltd.,* 618 F.Supp. at 135; *Sun Oil Western Sea Transport,* 1987 A.M.C. 1372 (S.D.N.Y.1978).

terized as an art than as an exact science." *Sun Oil Co. v. Mercedes Maria*, 1983 A.M.C. 718, 720 (E.D.Pa.), *rev'd sub nom. Sun Oil Co. of Pa. v M/T Carisle*, 771 F.2d 805, 816 (3d Cir.1985).[17] This case, in the view of the court, has been a poignant illustration of the preceding maxim. But when the final numbers are tallied, taking into account the myriad explanations of what happened to the oil, the pieces of the puzzle seem to fit together.

Plaintiff claims a loss of 4090 bbls. of oil. Defendant has accounted for a total of 1389 bbls. (167 + 761 + 461 = 1389 bbls.) The difference of 2701 bbls. minus the 255 bbls. considered engine slops, equals 2446 bbls. of oil. This figure approximates the O.B.Q. figure at Huelva of 2473 bbls.,[18] or stated differently, the amount that the Vessel had contained in its tanks after departing from New York. To the court, this appears to be the most reasonable explanation of what happened to the oil. As a result, defendant is liable for the remaining-unaccounted-for oil in the amount of 2446 bbls.

### III

■ Defendant correctly maintains that the measure of plaintiff's damages must be based upon the fair market value of the Cargo at the discharge port. *Kanematsu-Gosho Ltd. v. M/T Messiniaki Aigli*, 814 F.2d 115, 118 (2d Cir.1987); *Seguros Banvenez S.A. v. S/S Oliver Drescher*, 761 F.2d 855, 860–61 (2d Cir.1985); *Internatio, Inc. v. M.S. Taimyr*, 602 F.2d 49, 50 (2d Cir.1979); *M. Prusman Ltd. v. M/V Na-*

*thanel*, 684 F.Supp. 372, 374 (S.D.N.Y. 1988). Under COGSA § 1304(5), "[i]n no event shall the carrier be liable for more than the amount of damage actually sustained." Plaintiff sold the Cargo to Con Edison at $21.19 per barrel, an amount less than the purchase price of $22.50. The freight charge, as mentioned *supra*, was $1.82 per barrel. The amount of plaintiff's damages, therefore, amount to 2446 bbls. × $23.01 = $56,282.46.

■ Prejudgment interest is granted in admiralty cases absent exceptional circumstances. *Ingersoll Milling Mach. Co. v. M/V Bodena*, 829 F.2d 293, 310–11 (2d Cir.1987), *cert. denied sub nom. J.E. Bernard and Co. v. Ingersoll Milling Mach. Co.*, 484 U.S. 1042, 108 S.Ct. 774, 98 L.Ed.2d 860 (1988). It is within the broad discretion of the district court to determine the rate of interest and when it commences. *Ind. Bulk Transp., Inc. v. The Vessel "Morania Abaco"*, 676 F.2d 23, 26 (2d Cir.1982); *Standard Marine Towing Services, Inc. v. M.T. Dua Mar*, 708 F.Supp. 562, 569 (S.D.N.Y.1989). Here, the court finds that prejudgment interest should run from February 2, 1986, when defendant was obligated to deliver the full Cargo in good condition; and interest should be calculated on the average yield of six month Treasury Bills from February 2, 1986 through the date of judgment. *McCrann v. United States Lines, Inc.*, 803 F.2d 771, 774 (2d Cir.1986); *M Prusman Ltd. v. M/V Nathanel*, 684 F.Supp. at 374;

**17.** In a case of first impression, the Third Circuit in *Sun Oil Co. of Pa. v. M/T Carisle*, 771 F.2d at 812–13, disallowed a customary trade allowance of 0.5% in the oil shipping industry to explain losses for alleged short delivery on cargo transported under bills of lading subject to COGSA. Citing the legislative history of the Act, the court reasoned that upholding such an allowance would alter the statutorily prescribed burden of proof for unexplained losses, *see* § 1304(2)(q), by requiring that the shipper rather than the carrier prove some specific cause (such as the carrier's negligence) was responsible for the loss.

Courts in this Circuit have likewise refused to apply the 0.5% trade allowance. *Amerada Hess Corp. v. SS Philips Oklahoma*, 558 F.Supp. at

1167 n. 6; *Kerr–McGee Refining Corp. v. M/V La Libertad*, 529 F.Supp. at 85. It is worth noting that put to its burden in this case, defendant did in fact prove that approximately 0.6% of the total cargo was accounted for as an exception under COGSA.

**18.** Although neither the shore-quantity-loaded figure at Huelva nor the shore-quantity-discharged figure at Immingham were used in determining plaintiff's loss, it is interesting to note that the amount of additional cargo which remained on board from Huelva, and was eventually discharged at Immingham, equals 2400 bbls. or approximately the same amount as the O.B.Q. which arrived at Huelva, and approximately the same amount that the court determined plaintiff suffered as a loss.

*Armada Supply, Inc. v. S/T Agios Niko-las,* 613 F.Supp. 1459, 1470 (S.D.N.Y.1985).

The parties have agreed that monies presently held by plaintiff as withheld freight in the amount of $23,806.56, *see* Defendant's Post Trial Brief at 41, are to be applied to offset the judgment in that amount.[19]

### CONCLUSION

Plaintiff brought this admiralty action for short delivery of a Cargo of No. 6 fuel oil. Defendant successfully proved that part of the loss came within a 46 U.S.C. App. § 1304 exception for which defendant is not liable. Plaintiff demonstrated, however, that defendant's negligence was a concurrent cause of the loss and as such is entitled to all damages that defendant cannot segregate. Defendant by a preponderance of the evidence successfully segregated all but 2446 bbls. of the loss for which defendant is liable in the amount of $56,-282.46. Judgment will be entered in favor of plaintiff together with interest,[20] as discussed *supra,* and costs.

The parties are directed to submit judgment on ten (10) days notice.

SO ORDERED.

---

**19.** *See* letter from plaintiff dated July 20, 1989, stipulating that any monies withheld by plaintiff shall be applied to the judgment.

**20.** Post-judgment interest shall accrue at the rate set pursuant to 28 U.S.C.A. § 1961(a) (West Supp.1989).